## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOS SOUROVELIS, DOILA WELCH, and NORYS HERNANDEZ, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>vs.<br><br>CITY OF PHILADELPHIA;<br><br>MICHAEL A. NUTTER, in his official capacity as Mayor of Philadelphia;<br><br>PHILADELPHIA DISTRICT ATTORNEY'S OFFICE;<br><br>R. SETH WILLIAMS, in his official capacity as District Attorney of Philadelphia; and<br><br>CHARLES H. RAMSEY, in his official capacity as Commissioner of the Philadelphia Police Department;<br><br>      Defendants. | **COMPLAINT—CLASS ACTION**<br><br>Civil Action No. _____ |

## CLASS-ACTION COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Plaintiffs Christos Sourovelis, Doila Welch, and Norys Hernandez ("Named Plaintiffs") bring this civil-rights lawsuit on behalf of themselves and all others similarly situated under Rule 23(b)(2) of the Federal Rules of Civil Procedure for claims of primarily injunctive and declaratory relief for violations of their rights guaranteed by the Due Process Clause of the Fourteenth Amendment.

2.      Under a little-known legal device called civil forfeiture, Philadelphia law enforcement has been confiscating property from its residents under the fiction that the property itself is "guilty" of a crime.  Even if the owner of the property has no involvement or even knowledge of the alleged crime, as with the Named Plaintiffs in this action, the Philadelphia District Attorney's Office sues the property in civil actions (with unusual names like *Commonwealth v. One 1958 Plymouth Sedan* and *Commonwealth v. 605 University Drive, State College, Pa.*), and requires property owners to come to court to prove their innocence. Notwithstanding the direct conflict of interest, if the Philadelphia District Attorney's Office ("Philadelphia D.A.'s Office") wins the lawsuit against the property, it retains the property or proceeds from its sale for the office's own use.

3.      While Pennsylvania law authorizes civil forfeiture, the Philadelphia D.A.'s Office has turned this tool into a veritable machine, devouring real and personal property from thousands of residents, many of whom are innocent, and converting that property into a $5.8 million average annual stream of revenue.  Using a rigged system of copied "form" legal documents and endless proceedings in a court run by the prosecutors themselves, Philadelphia's "robo-forfeiture" program stripped thousands of City residents of over 1,000 residences, 3,200 vehicles, and $44 million in cash over an eleven-year period, ultimately raking in more than $64

million in revenue wholly outside its appropriated budget.

4.      Plaintiffs bring this class action to enjoin and declare unconstitutional Philadelphia's civil-forfeiture policies and practices, which not only unconstitutionally deprive people of their property, but also of their constitutional right to due process of law.

## JURISDICTION

5.      Plaintiffs bring this class-action, civil-rights lawsuit pursuant to 42 U.S.C. § 1983 for violations of their rights under the Due Process Clause of the Fourteenth Amendment; 42 U.S.C. § 1988; and the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202.  Plaintiffs seek injunctive and declaratory relief against Defendants' policies and practices in investigating, prosecuting, and profiting from civil-forfeiture actions.

6.      Accordingly, this Court has jurisdiction over this action under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil-rights jurisdiction).

## VENUE

7.      Venue is proper in the United States District Court for the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Philadelphia, which is located in the Eastern District of Pennsylvania. *See* 28 U.S.C. § 118.

8.      Venue is also proper under 28 U.S.C. § 1391(b)(1) because all Defendants are domiciled in the Commonwealth of Pennsylvania, and at least one Defendant is domiciled in Philadelphia.

## THE PARTIES

### I.      THE PLAINTIFFS

9.      Plaintiff Christos Sourovelis is an adult lawful permanent resident of the United

States.  Mr. Sourovelis owns and operates his own business in home construction, a trade his family practiced in Athens, Greece.  He has lived in Philadelphia for over 30 years.  In 2007, Mr. Sourovelis purchased a single-family home in North Philadelphia and has been living there with his family since December of that year.  Mr. Sourovelis holds title to this property.  He has never been charged with any crime.  Yet, without any notice or opportunity to be heard, Mr. Sourovelis and his family were evicted from their home for seven days by officers of the Philadelphia Police Department due to Defendants' civil-forfeiture policies and practices.  Mr. Sourovelis also stands to lose his family's home through a civil-forfeiture proceeding initiated by District Attorney Williams and the Philadelphia D.A.'s Office.

10.      Plaintiff Doila Welch is an adult citizen of the United States.  In the 1990s, her parents bought a three-story, six-bedroom, multi-family row home in South Philadelphia.  When they passed away, Ms. Welch along with her siblings inherited the property which serves as a haven to her, her siblings, and their children.  Ms. Welch is the administrator of the estate. Currently, Ms. Welch resides in this home with her children, brother, and sister.  Ms. Welch suffers from lupus and severe rheumatoid arthritis which make it difficult for her to be mobile. Ms. Welch's sister, who lives with her, suffers from a cognitive disability.  Neither Ms. Welch nor her siblings have been charged with any crime.  Yet, she stands to lose her family home through a civil-forfeiture proceeding initiated by District Attorney Williams and the Philadelphia D.A.'s Office.

11.      Plaintiff Norys Hernandez was born in Puerto Rico and is an adult citizen of the United States.  After working for years in the financial sector at Wells Fargo, Mrs. Hernandez recently finished school to become a medical office assistant.  Ms. Hernandez and her family have lived in Philadelphia for over 25 years and together with her sister, Sonia Gonzalez, she

owns a two-story row house in North Philadelphia.  Mrs. Hernandez and her family purchased this property to provide her sister and her sister's children with a home.  Although police arrested Mrs. Hernandez's nephew for a drug crime, neither Mrs. Hernandez nor her sister were charged with any crime.  Yet, Mrs. Hernandez and her sister stand to lose this property through a civil-forfeiture proceeding initiated by District Attorney Williams and the Philadelphia D.A.'s Office.

12.     Plaintiffs Mr. Sourovelis, Ms. Welch, and Mrs. Hernandez represent a putative class of all individuals who own property that is or will be the subject of a forfeiture petition brought by the Philadelphia D.A.'s Office.

## II.    THE DEFENDANTS

13.     Defendant City of Philadelphia is a municipality of the Commonwealth of Pennsylvania.  The City of Philadelphia funds both the Philadelphia District Attorney's Office and the Philadelphia Police Department.  The City of Philadelphia is Pennsylvania's only consolidated city-county and covers over 140 square miles with over 1.5 million residents.

14.     Defendant Michael A. Nutter is the mayor of Philadelphia.  As Mayor, he is responsible for supervising Police Commissioner Ramsey.  Mayor Nutter is sued in his official capacity.

15.     Defendant Philadelphia District Attorney's Office ("Philadelphia D.A.'s Office") is the largest prosecutor's office in Pennsylvania, employing 600 lawyers, detectives, and support staff.  According to the website of the Philadelphia D.A.'s Office, the Public Nuisance Task Force—a specialized unit within the Philadelphia D.A.'s Special Operations Division— "handles all forfeiture-related litigation, the maintenance of seized assets and the investigation of potentially forfeitable assets."  The Philadelphia D.A.'s Office receives forfeited property or its proceeds.  Under state law, the forfeited property and its proceeds must be used to enforce

provisions of the Controlled Substance, Drug, Device, and Cosmetic Act.

16.     Defendant R. Seth Williams is the District Attorney of Philadelphia, the chief law

enforcement officer for the City and County of Philadelphia.  Under the Commonwealth of

Pennsylvania's Constitution and statutes, D.A. Williams is an independent officer, directly

elected by Philadelphia residents.  D.A. Williams is responsible for overseeing all aspects of the

Philadelphia D.A.'s Office, including the Public Nuisance Task Force.  Upon information and

belief, D.A. Williams has signed an agreement to share forfeiture proceeds with the Philadelphia

Police Department.  D.A. Williams is sued in his official capacity.

17.     Defendant Charles H. Ramsey is the Commissioner of the Philadelphia Police

Department, which is the City's primary law-enforcement agency.  As head of the nation's fourth

largest police department, Commissioner Ramsey is responsible for overseeing the 6,600 sworn

members and 800 civilian personnel serving the 21 police districts in Philadelphia.  Officers of

the Philadelphia Police Department enforce civil-forfeiture laws, in part, by drafting arrest

reports for predicate offenses, drafting receipts for property that has been seized for civil

forfeiture, and enforcing orders to seize and seal real property for forfeiture.  The Philadelphia

Police Department has received forfeited property or its proceeds for the purpose of enforcing

provisions of the Controlled Substance, Drug, Device, and Cosmetic Act.  Upon information and

belief, Commissioner Ramsey has signed an agreement on behalf of the Philadelphia Police

Department to share in forfeiture proceeds with the Philadelphia D.A.'s Office.  Commissioner

Ramsey is sued in his official capacity.

18.     Defendants the Philadelphia D.A.'s Office, D.A. Williams and Police

Commissioner Ramsey are collectively referred to as Law-Enforcement Defendants.

19.     At all relevant times, all Defendants were acting under color of state law.

- 6 -

## FACTUAL ALLEGATIONS

### I.   PENNSYLVANIA'S CONTROLLED SUBSTANCES FORFEITURE ACT

20.     Civil forfeiture is a legal mechanism by which law enforcement can permanently deprive individuals of real and personal property that is more likely than not connected to specified crimes.

21.     Based on the legal fiction that the property itself is guilty, a civil-forfeiture action in Pennsylvania is an *in rem* proceeding against the property itself, with the Commonwealth as the plaintiff and the property as the defendant.

22.     Although forfeiture proceedings are civil in form, Pennsylvania courts have recognized that forfeiture proceedings are quasi-criminal in nature because they involve constitutional rights normally only implicated in criminal proceedings.

23.     Nevertheless, property owners defending against forfeiture proceedings are not guaranteed counsel and the allocations of burdens of proof mirror those of civil rather than criminal proceedings.  Specifically, in civil-forfeiture cases the government is only required to prove the property's connection to a crime by a preponderance of the evidence, rather than the more difficult "beyond a reasonable doubt" standard that applies in criminal proceedings.

24.     In Pennsylvania, one of the most common statutory bases for forfeiture is the Controlled Substances Forfeiture Act, 42 Pa. Cons. Stat. §§ 6801 and 6802.  Enacted in 1988, the Controlled Substances Forfeiture Act authorizes forfeiture of real and personal property connected to a violation of the Controlled Substance, Drug, Device and Cosmetic Act, 35 Pa. Con. Stat. §§ 780-101 to 780-144, (a "controlled-substance violation").

25.     The Controlled Substances Forfeiture Act enumerates the kind of property subject to forfeiture.  42 Pa. Cons. Stat. § 6801(a).  The Act specifically subjects the following property

to forfeiture:

- all vehicles "which are used or are intended for use to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment" of drugs, drug paraphernalia, or materials used to manufacture drugs;

- "money, negotiable instruments, securities or other things of value" that are:

  1. "furnished or intended to be furnished by any person in exchange for" drugs
  2. traceable as proceeds of such an exchange; or
  3. used or intended to be used to facilitate any controlled-substances violation; and

- "[r]eal property used or intended to be used to facilitate" a controlled-substances violation.

*Id.* § 6801(a)(4), (6).  Additionally, money "found in close proximity" to illegal drugs is "rebuttably presumed to be proceeds derived from the selling of" illegal drugs.  *Id.* § 6801(a)(6)(ii).  Under the Act, law enforcement may seize the above-listed types of property without process if there is probable cause to believe that the property has been used or is intended to be used for a controlled-substance violation.  *Id.* § 6801(b).

26.     The Controlled Substances Forfeiture Act outlines the procedures governing forfeiture.  *See* 42 Pa. Cons. Stat. § 6802.  First, it enumerates the required contents of a petition for forfeiture and where it should be filed.  *Id.* § 6802(a).  Second, it establishes the requirements for providing sufficient notice of the forfeiture petition to the property owner.  *Id.* § 6802(b)–(e).  Third, the Act implements a burden-shifting framework that puts the onus of proving innocence on the property owner; if the Commonwealth produces evidence that the property is subject to forfeiture, its owner must prove his or her lack of knowledge or consent of the conduct giving rise to the forfeiture.  *Id.* § 6802(j).  By judicial interpretation, the Act requires an evidentiary hearing in open court before property can be taken from an individual and forfeited to the Commonwealth.  *Commonwealth v. 605 University Drive, State College, Pa.*, 61 A.3d 1048,

1054 (Pa. Commonw. Ct. 2012).

27.     The Controlled Substances Forfeiture Act also provides an *ex parte* procedure to obtain "a restraining order or injunction, require the execution of a satisfactory performance bond or take any other action to preserve the availability of [the] property . . . for forfeiture." 42 Pa. Con. Stat. § 6802(f).  Under § 6802(g), an *ex parte* temporary restraining order may be entered "if the Commonwealth demonstrates that there is probable cause to believe that the property with respect to which the order is sought would be subject to forfeiture [ ] and that provision of notice will jeopardize the availability of the property for forfeiture."

28.     Finally, the Controlled Substances Forfeiture Act governs the use and distribution of forfeited property and its proceeds.  Specifically, if the law enforcement authority seizing the property has county-wide jurisdiction (rather than statewide jurisdiction), the Act requires forfeited property to be transferred to the custody of the district attorney for that county.  42 Pa. Cons. Stat. § 6801(e).

29.     The Act also authorizes district attorneys to either sell forfeited property or retain it for official use.  *Id.*  If sold, proceeds from the sale of forfeited property must "be used to pay all proper expenses of the proceedings for forfeiture and sale, including expenses of seizure, maintenance of custody, advertising and court costs." 42 Pa. Cons. Stat. § 6801(e).

30.     The balance of the forfeiture proceeds goes to the district attorney's office, or in cases in which both municipal and state law-enforcement entities were substantially involved, the proceeds are distributed equally between the district attorney and the Attorney General.  42 Pa. Cons. Stat. § 6801(f)-(g).

31.     The Act further provides that the "entity having budgetary control shall not anticipate future forfeitures or proceeds therefrom in adoption and approval of the budget for the

district attorney." 42 Pa. Cons. Stat. § 6801(f).  Consequently, these forfeiture funds are a "bonus" to law-enforcement agencies and wholly outside oversight by the funding county.

32.     The Act requires district attorneys to use forfeited property or derived proceeds to enforce the provisions of the Controlled Substance, Drug, Device and Cosmetic Act. *Id.* § 6801(h).  The Act also authorizes district attorneys to designate forfeiture proceeds for community-based drug and crime-fighting programs. *Id.*

33.     Based on information from the Attorney General's Office, D.A.'s offices in Pennsylvania, including Philadelphia, use forfeiture funds to pay salaries and purchase vehicles, equipment and other items and services of institutional value.

## II.     PHILADELPHIA'S FORFEITURE PROGRAM IS UNPRECEDENTED IN SCALE.

34.     Cashing in on the authority to retain forfeiture property and derived proceeds, the Philadelphia District Attorney's Office has brought in more than $90 million in forfeiture revenue since 1987.  *See* Isaiah Thompson, "The $10 Million Question," *Philadelphia City Paper*, Nov. 29, 2012, *available at* http://issuu.com/phillycp/docs/cp_2012-11-29.

35.     Philadelphia has one of the largest municipal forfeiture programs in the country, yielding an average of $5.8 million in forfeiture revenue each year.

36.     By contrast in 2010, Kings County (Brooklyn), with a population 1.5 times that of Philadelphia, and Los Angeles County, with a population more than 6.5 times that of Philadelphia, each brought in $1.2 million in annual forfeiture revenue.

37.     When measured against other counties in Pennsylvania—in other words, when measured against other jurisdictions operating under the same state forfeiture law—Philadelphia is in a class of its own.  Between 2004 and 2009, Philadelphia collected approximately $36 million through civil forfeiture—an amount twice that of the three next-largest counties in

Pennsylvania combined.  And since 2009, Philadelphia's forfeiture pot has kept growing.

38.    Forfeiture data obtained from the Pennsylvania Office of the Attorney General reveal the extent to which Philadelphia's forfeiture activity far exceeds that of other Pennsylvania counties.  From Fiscal Years 2002 through 2012, the Philadelphia D.A.'s Office collected a total of $64,219,356.00 in forfeiture revenue, while the remaining 66 county D.A.'s Offices collected a combined total of $84,419,638.50.  That means that for this eleven-year period, Philadelphia's forfeiture revenue amounted to 43 percent of the statewide total.  The amount each D.A.'s Office collected in forfeiture revenue is illustrated below in Table 1.



39.    In statistical terms, the amount of Philadelphia's forfeiture revenue is almost 8 standard deviations above the mean.  In laymen's terms, Philadelphia is as aberrant as a 7-foot-tall woman or an 8-foot-tall man.

40.    Even accounting for differences in population size and assuming that more populous counties will take in more in forfeiture revenue, the Philadelphia D.A.'s Office is still an outlier.  As illustrated below in Table 2, the Philadelphia D.A.'s Office collected $42.59 in *per capita* forfeiture revenue, more than twice that of the next most active county.



41.     From Fiscal Years 2002 through 2012, the amount of civil-forfeiture revenue collected by the Philadelphia D.A.'s Office (prior to any disbursements by the Office) averaged close to one-fifth of the general budget of the D.A.'s Office as appropriated by the City of Philadelphia.

42.     By comparison, the civil-forfeiture revenue taken in by the District Attorney's Office for Allegheny County, the second largest county in Pennsylvania, averaged approximately 8.7 percent of that office's general appropriated budget.

43.     On the expense side of the equation, the Philadelphia D.A.'s Office spends much of its forfeiture revenue to pay salaries, including the salaries of the prosecutors that administer Philadelphia's civil-forfeiture program.

44.     Using forfeiture proceeds to pay the salaries of the very individuals responsible for pursuing forfeiture presents a direct conflict of interest.

45.     The Philadelphia D.A.'s Office spends twice as much of its forfeiture revenue on salaries as all other county D.A.'s offices combined.  From Fiscal Years 2002 through 2012, the Philadelphia D.A.'s Office spent $25,516,155 of its forfeiture revenue on salaries, compared to

$12,315,340.43 spent on salaries by all other D.A.'s Offices in the Commonwealth. The amount
of forfeiture revenue D.A. offices in the Commonwealth spent on salaries during Fiscal Years
2002 through 2012 is illustrated below in Table 3.



46.     Again, taking into account population size, the total amount *per capita* that
Philadelphia spent on salaries during this time period was $16.92, while all other counties
combined only spent $1.11 *per capita*.

47.     In contrast, from Fiscal Years 2002 through 2012, the Philadelphia D.A.'s Office
spent none of its forfeiture revenue on community-based drug and crime-fighting programs
under 42 Pa. Cons. Stat. § 6801(h), despite its professed goal of helping communities combat
drugs.

48.     By written agreement, the Philadelphia D.A.'s Office has shared forfeiture
proceeds with the Philadelphia Police Department. Under the terms of this agreement, the first
$927,500 forfeited each fiscal year was apportioned as follows: $727,500 to the Philadelphia
D.A.'s Office to cover "forfeiture related administrative expenses," including salaries; and

$200,000 to the Philadelphia Police Department.  After distributing the initial $927,500, the agreement calls on the balance of the forfeiture revenue to be divided, with 40 percent going to the Philadelphia D.A.'s Office and 60 percent going to the Philadelphia Police Department. Upon information and belief, District Attorney Williams and Police Commissioner Ramsey have executed a substantially similar agreement to share forfeiture proceeds that is in effect today.

### A.    Defendants Seize Large Quantities of Personal Property for Forfeiture.

49.     Rather than being the product of a few large forfeitures from drug "kingpins," Philadelphia's forfeiture fund is amassed through seizing an unprecedented amount of personal and real property from thousands of ordinary—and often innocent—property owners.

50.     The bulk of Philadelphia's forfeiture revenue comes from confiscating cash.

51.     From Fiscal Years 2002 through 2012, Philadelphia seized and forfeited $44,291,178.00 in cash.

52.     Notably, this amount was accumulated from thousands of cases involving small sums of money, rather than a few large busts.

53.     In 2010, Philadelphia filed 8,284 currency forfeiture petitions, with an average of $550 involved in each case.

54.     In a random sample of more than 100 currency-forfeiture cases from 2011 to 2012 that investigative reporter Isaiah Thompson reviewed, the median amount of cash at stake in each forfeiture case was only $178.  *See* Isaiah Thompson, "The Cash Machine," *Philadelphia City Paper*, Nov. 29, 2012, *available at* http://citypaper.net/article.php?The-Cash-Machine-19189.  In many of these cases, the amount involved was less than $100.

55.     Defendants' pattern, policy and practice of taking such small amounts of money from people who are never convicted of (or even charged with) a crime raises serious concerns

about whether the seized money is in fact connected to criminal activity.

56.     Defendants also seize a large number of vehicles through their forfeiture power. From Fiscal Years 2002 through 2012, Philadelphia seized and forfeited 3,290 vehicles.

57.     Vehicles are frequently seized on the grounds that they are connected to the crime of soliciting prostitutes. However, neither Pennsylvania law nor the City of Philadelphia Code authorizes forfeiture for solicitation.

58.     Philadelphia also relies on civil forfeiture to seize other kinds of personal property from individuals, including but not limited to cell phones, clothing, jewelry, prescription medication, licensed firearms, and in one instance, a woman's jumper cables.

### B.     Defendants "Seize and Seal" As Well As Restrain Numerous Real Properties for Forfeiture.

59.     Philadelphia aggressively uses civil forfeiture to seize and restrain real property on a scale unlike that of any other county in Pennsylvania.

60.     The Philadelphia D.A.'s Office files civil forfeiture petitions on 300 to 500 real properties (mostly private residences) annually. Approximately an average of 100 of these properties are forfeited and sold at auction annually with the D.A.'s Office retaining the proceeds. A significant majority of the remaining real property cases "settle" under the threat of civil forfeiture.

61.     Meanwhile, from 2008 through 2011, the three next-largest counties in Pennsylvania combined took only a dozen real properties through civil forfeiture.

62.     As illustrated in Table 4 below, from Fiscal Years 2002 to 2012, Philadelphia forfeited 1,172 real properties compared to just 56 real properties forfeited by all other counties combined.



III. **THIS HIGH VOLUME OF FORFEITURE IS ENABLED BY PHILADELPHIA'S ROBO-FORFEITURE MACHINE.**

63.     The enormous volume of forfeiture cases—and ultimately the very substantial amount of revenue generated—is all accomplished through a mechanized, assembly-line system operated by a handful of prosecutors within a specialized unit of the Philadelphia D.A.'s Office called the Public Nuisance Task Force.

64.     The Public Nuisance Task Force files thousands of forfeiture petitions each year.

65.     In 2011 alone, the Public Nuisance Task Force filed 6,560 civil-forfeiture petitions.

66.     By contrast, the Allegheny County D.A.'s Office—which serves the second-largest county in Pennsylvania—filed roughly just 200 civil-forfeiture petitions from 2008 to 2011.

67.     The Public Nuisance Task Force handles all forfeiture-related litigation, the maintenance of seized property, and the investigation of potentially forfeitable property.

68.     The Public Nuisance Task Force consists of approximately nine prosecutors, and 15 prosecution assistants, paralegals, and other support staff.

69.     Each assistant district attorney in the Public Nuisance Task Force is assigned to a geographic area of Philadelphia.

70.     Each assistant district attorney in the Public Nuisance Task Force is responsible for either civil-forfeiture cases involving personal property or civil-forfeiture cases involving real property.

A.     *Philadelphia's Forfeiture Machine Uses an Automated Assembly-Line System to Maximize Petitions for Forfeiture, and Ultimately Revenue.*

71.     The Public Nuisance Task Force generates the high volume of civil-forfeiture petitions by relying on its prosecution assistants, paralegals, and support staff to simply copy information from Philadelphia Police Department Arrest Reports and Property Receipts onto form documents that become the Notice of Forfeiture and Petition for Forfeiture.

72.     Before filing petitions for forfeiture of real property, it is the policy and practice of the Public Nuisance Task Force to obtain *ex parte* temporary restraining orders for real property under 42 Pa. Cons. Stat. § 6802(f) and (g) mandating that "no interest in this property (including but not limited to ownership, tenancy, easement, and purchase or rental option) may be sold, assigned, optioned, given, bequeathed or transferred in any manner." The temporary restraining order directs the Prothonotary to file the order without fee and index it as a *lis pendens*.

73.     It is the policy and practice of the Philadelphia D.A.'s Office to apply for temporary restraining orders without making any evidentiary showing that providing the property owner with notice will jeopardize the availability of the property for forfeiture.

74.     In addition to applying for temporary restraining orders to restrain the transfer of the target property, it is the policy and practice of the Public Nuisance Task Force to apply for an *ex parte* order to seize and seal the premises under 42 Pa. Cons. Stat. § 6802(f) and (g).

- 17 -

Applications to seize and seal contain the bald, conclusory allegation that Commonwealth is moving for forfeiture of the real property under 42 Pa. Cons. Stat. §§ 6801, 6802 "because it was used and/or continues to be used (or intended to be used) to commit, or to facilitate the commission of, violations of the Controlled Substances Act." The application also contains minimal factual allegations copied verbatim from the Philadelphia Police Department Arrest Report, which is incorporated and attached to the application.

75.     It is the policy and practice of the Public Nuisance Task Force to apply for an order to seize and seal real property without providing any particularized evidence that the order is needed to preserve the specific property for civil forfeiture.

76.     It is the policy and practice of the Public Nuisance Task Force to apply for an order to seize and seal real property without making any particularized showing of exigent circumstances or that a temporary restraining order restricting transfer of the property will be insufficient to protect Defendants' interests during the pendency of the civil-forfeiture proceedings.

77.     It is the policy and practice of the Public Nuisance Task Force to apply for an order to seize and seal real property without giving property owners any notice or opportunity to be heard.

78.     Members of the putative class often first learn that their home is threatened with forfeiture when officers of the Philadelphia Police Department appear at their home, and armed with the order to seize and seal the premises, forcibly evict them and all residents without any prior notice.

79.     It is Defendants' policy and practice to send property owners threatened with civil forfeiture three form documents:  (i) a notice of forfeiture; (ii) a verified petition for forfeiture;

and (iii) a notice of hearing.

80.     The notice of forfeiture is addressed "to the claimant of the within described property," that is, the person claiming any interest in the property threatened with civil forfeiture.

81.     The form notice states that "you are required to file an answer to this petition, setting forth your title in, and right to possession of, said property within thirty (30) days from the service hereof, and you are also notified that if you fail to file an answer, a decree of forfeiture and condemnation will be entered against the property."

82.     The petition for forfeiture contains allegations taken verbatim from the Police Department Arrest Report.

83.     The form petition for forfeiture also contains a bare assertion that the property "was used and/or continues to be used (or intended to be used) to commit, or to facilitate the commission of, violations of the Controlled Substance[, Drug, Device and Cosmetic] Act."

84.     The petition also includes a form affirmation that Assistant District Attorney Beth Grossman, the head of the Public Nuisance Task Force, or the assigned assistant district attorney "affirm that the facts set forth in the foregoing petition are true and correct to the best of her/his knowledge, information, and belief."

85.     The notice of hearing states that a hearing on the forfeiture petition (and if applicable, on the entry of a restraining order and application to seize and seal the property) is set for a specified date and time in Courtroom 478, City Hall, Philadelphia, Pennsylvania.

86.     Court records demonstrate that it is Defendants' policy and practice to list anywhere from 40 to 80 civil-forfeiture actions to be heard in Courtroom 478 in a single day.

### B.     *Property Owners Must Make Their Way Down the Legal Rabbit Hole of "Courtroom" 478.*

87.     Property owners who seek to fight the civil forfeiture and reclaim their property

must show up in Courtroom 478 in City Hall by 9:00 a.m.

88.     In Courtroom 478, property owners are instructed to sign in and indicate with a checkmark on the sign-in sheet the kind of property they are there to save. The sign-in sheet lists the following categories of property: "house," "car," "money," or "gun."

89.     Assistant district attorneys with the Public Nuisance Task Force fully control the proceedings inside "Courtroom" 478. There is no judge, no jury, and not even a court reporter to transcribe these "public hearings."

90.     The prosecutors occupy both tables reserved for counsel, with prosecutors handling forfeiture cases for real property at the table on the right and prosecutors handling forfeiture cases for personal property at the table on the left.

91.     The prosecutors call the civil-forfeiture cases by comparing the sign-in sheet with the docket calendar for Courtroom 478.

92.     Upon information and belief, for listed cases in which property owners fail to appear in Courtroom 478, the prosecutors mark the case for default judgment, without any determination, judicial or otherwise, as to the reason the property owner did not appear.

93.     For listed cases in which the property owner is present, the assigned prosecutor discusses the case with the property owner. These conversations frequently take place out in the hall, in the empty jury box, or at a small table in the back of the room.

94.     On first listings, these conversations are typically short, lasting no more than several minutes. Invariably prosecutors ask the property owners to return with documentation supporting proof of legal ownership to the property.

95.     Prosecutors frequently advise property owners that their civil-forfeiture case is not complicated and they do not need an attorney.

96.     Prosecutors routinely give property owners a set of more than 50 interrogatories, with multiple discrete subparts.  These interrogatories must be answered under penalty of perjury.

97.     In cases in which there is an order to seize and seal, prosecutors compel property owners to execute an agreement to unseal the residence on certain conditions, including but not limited to, barring specified individuals including relatives from entering the residence indefinitely and waiving in any future civil-forfeiture action their statutory innocent-owner defense and their constitutional defense that the forfeiture constitutes an excessive fine.

98.     Prosecutors routinely continue and relist civil-forfeiture cases and they unilaterally determine whether any documentation provided by the property owner is sufficient.

99.     When a case is relisted, the assigned assistant district attorney fills in a form from the Forfeiture Program of the Civil Trial Division of the First Judicial District of Pennsylvania Court of Common Pleas of Philadelphia County, which instructs the property owner to return to Courtroom 478 in City Hall on a specified date (typically a month later) at 9:00 a.m.  The form advises the property owner:

PLEASE BE ON TIME.
A FAILURE TO APPEAR MAY RESULT IN YOUR PETITION
BEING DISMISSED OR YOUR PROPERTY BEING FORFEITED.

100.    Property owners contesting a forfeiture action may be required to appear as many as a dozen times in Courtroom 478 over the course of months or even years before the case is concluded.

101.    In a review of 8,284 civil-forfeiture cases, property owners have been forced to return to Courtroom 478 an average of five times, risking a default judgment if they failed to appear just once.  And more than 100 property owners were required to return to Courtroom 478

ten times or more.  *See* Isaiah Thompson, "The Cash Machine," *Philadelphia City Paper*, Nov.

28, 2012, *available at* http://citypaper.net/article.php?The-Cash-Machine-19189.

## IV.   THE NAMED PLAINTIFFS GET ENSNARED IN PHILADELPHIA'S "ROBO-FORFEITURE" MACHINE.

102.   Defendants' policies and practices threaten each of the Named Plaintiffs with the

loss of their property and have already violated their constitutional rights to due process of law.

### A.   *Named Plaintiff Christos "Chris" Sourovelis*

103.   Around noon on March 27, 2014, Christos "Chris" Sourovelis received a phone

call from his neighbor, an officer in the Philadelphia Police Department, informing him out of

courtesy that police were at his home.

104.   Mr. Sourovelis immediately called his wife, Markela, who was home at the time.

When she answered, all Mr. Sourovelis could hear was her sounding very upset and some

commotion before the phone fell silent.

105.   Mr. Sourovelis promptly left work to drive the hour-long ride home, calling his

wife multiple times en route with no answer.  Mr. Sourovelis learned later from his wife that the

police had taken the phone from his wife and refused to let her answer.

106.   When Mr. Sourovelis arrived, he learned that four armed law-enforcement

officers came to his home around noon to execute a search warrant, claiming that there were

drugs in the house.

107.   When the police arrived, Markela saw them from a window on the second floor of

the house.  They were outside the front door, which was unlocked.  When she came downstairs,

she found that the door had been opened and a gun placed next to their family dog Max's head.

108.   After the police told her that they would shoot Max if she did not open the door,

Markela agreed to let the officers in.  But when Markela momentarily closed the front door in

order to secure Max in an adjoining bedroom, the officers forced their way into the home.

109.    The officers searched through the house and found Mr. Sourovelis's son, Y.S., with a small amount of drugs and drug paraphernalia.  Y. S. had been observed by a police officer selling $40 worth of drugs.  After being arrested and arraigned, Y.S., who had no prior record, was directed to a diversion program requiring him to attend a drug rehabilitation program.

110.    Y. S. is an honors student and at the time of his arrest was preparing to attend Temple University.  While working at a restaurant/bar as a cook, he fell in with the wrong crowd.  He has never been in trouble with the law before.

111.    A little over a month later, on May 7, 2014, Assistant District Attorney Daren Waite obtained an *ex parte* order to seize Mr. Sourovelis's home and seal it to prevent entry.

112.    On or about the morning of May 8, 2014, Mr. Sourovelis was driving Y.S. to the drug rehabilitation center to begin treatment when he received a frantic call from his wife. Officers from the Philadelphia Police Department had come to the home, once again without any notice, to order the family to leave their home pursuant to the "seize and seal" order that ADA Waite had obtained the day before.

113.    This was how Mr. Sourovelis and his family learned that they could permanently lose their entire home through civil forfeiture due to the small amount of drugs Y. S. had possessed and sold.

114.    Mr. Sourovelis was instructed that to contest the forfeiture of his home and the order to seize and seal, he would have to attend a hearing set for May 14, 2014 at 9:15 a.m. in Courtroom 478 in City Hall.

115.    When Mr. Sourovelis and his wife arrived, there was no judge, no jury.  They

eventually spoke to ADA Waite who confirmed that they were not represented by counsel and then advised Mr. Sourovelis that he wouldn't need a lawyer for this proceeding.

116.    ADA Waite further informed Mr. Sourovelis that in order for his house to be unsealed so his family could return home, he and his wife would have to agree to a number of conditions, including agreeing that Y.S. would not be permitted to enter his home for any reason for an indefinite period of time.  Other conditions included relinquishing, in any future forfeiture action, both Mr. Sourovelis's innocent-owner defense under Pennsylvania law as well as his constitutional right to challenge the forfeiture of his home as an excessive fine.

117.    Without the assistance of counsel, both Mr. Sourovelis and his wife reluctantly signed the agreement in order to be let back into their home.

118.    In all, the seize-and-seal order caused the Sourovelis family to be forcibly evicted from their home for at least seven days.  It took three to four more days after Mr. and Mrs. Sourovelis signed the agreement to get the front door lock fixed (after the police broke it) and to get the power, water and other utilities—which the City of Philadelphia had turned off—running again.

119.    The forfeiture case against their home was relisted for June 13, 2014.  At that time, ADA Waite instructed Mr. and Mrs. Sourovelis to respond in handwriting to each allegation contained in the forfeiture petition.  The case was then relisted once again for July 10, 2014.

120.    On July 7, 2014, around 4:30 PM, Mrs. Sourovelis received an email from ADA Waite instructing Mr. Sourovelis to answer the attached interrogatories within thirty days.  The accompanying letter stated that the forfeiture action was next listed for July 10, 2014 and directed Mr. Sourovelis to complete the interrogatories and attach and mail all requested

documents to ADA Waite. These interrogatories contained 50 questions with numerous
subparts. The interrogatories contained an affirmation for Mr. Sourovelis to sign that all
foregoing answers are true and correct to the best of his knowledge, information and belief, and
that he "understands that the facts herein are verified subject to penalties for unsworn
falsification to authorities."

121.    At the July 10, 2014 hearing, ADA Waite personally handed Mr. Sourovelis a
copy of the interrogatories and relisted the case until August 12, 2014.

122.    Mr. Sourovelis's youngest son, Y.S., completed his drug rehabilitation program
on or about June 10, 2014 and since that time has been living with his older brother.

123.    Both Mr. and Mrs. Sourovelis want their youngest son to be back in their home so
they can keep an eye on him and make sure that he complies with the requirements of the
diversion program and keeps out of additional trouble.

124.    Mr. Sourovelis and his family have suffered irreparable injuries from being
evicted from their home without notice or an opportunity to be heard before a neutral arbiter.

125.    Mr. Sourovelis continues to suffer hardship due to his son being barred from
living in, or even entering, his home.

126.    Mr. Sourovelis has suffered and continues to suffer hardship by being required to
take off from work and drive 30-40 minutes fighting traffic to attend "hearings" in Courtroom
478.

127.    Mr. Sourovelis has spent significant time, labor, and money in furnishing and
renovating his home, including a garden in the backyard that contains custom masonry work
built by Mr. Sourovelis himself.

128.    Mr. Sourovelis is also threatened with irreparable injury of losing his home of

almost seven years, where his wife, two daughters, and until recently his youngest son, live with Max the dog.

### B.   *Named Plaintiff Doila Welch*

129.   On Saturday, February 1, 2014, while still in bed, Plaintiff Doila Welch was startled by police officers running upstairs to her bedroom with guns drawn.

130.   Upon information and belief, the officers did not have a warrant to gain entry into the residence.

131.   At the time, Ms. Welch's 12-year old daughter was showering in the second-floor bathroom and her 23-year old son was in his bedroom on the third floor.

132.   Police ordered all occupants downstairs, barely allowing Ms. Welch's daughter to get dressed.  Due to her physical disability, Ms. Welch required assistance in getting dressed and descending the stairs.  A female officer was called to assist.

133.   The police officers conducted a search of the house, kicking in Ms. Welch's son's bedroom door, breaking his gaming system, and taking $40 in cash that was on his bedside table, money Ms. Welch had given him to purchase a jacket.

134.   The officers did not find any drugs or drug paraphernalia in Ms. Welch's son's room.

135.   Unbeknownst to Ms. Welch, however, her husband had been selling marijuana out of her home.  Ms. Welch and her husband had been alienated for some time due to martial problems.

136.   At the time of the police entry, Ms. Welch's husband, Ronald Requena, Sr., was in the kitchen on the main floor.  Police arrested Mr. Requena, Sr. for selling drugs.

137.   Police also arrested Ms. Welch's son on conspiracy charges.

138.    Police officers informed Ms. Welch and the remaining occupants that they were not permitted to remain in the house and instructed them to gather their belongings.

139.    After Ms. Welch's protests and pleading based on her and her sister's medical conditions, she was advised that they could remain in the house but that both Mr. Requena and Ms. Welch's son would not be permitted in the house.

140.    On February 19, 2014, Assistant District Attorney James Dellafiora filed a forfeiture petition against Ms. Welch's home.

141.    On February 19, 2014, ADA Dellafiora also filed an *ex parte* application to seize Ms. Welch's home and seal it to prevent entry.  The Court of Common Pleas entered a seize-and-seal order for the property that same day.

142.    On February 19, 2014, a "hearing" on the civil-forfeiture petition was set for March 3, 2014 in Courtroom 478.  Due to a snowstorm, this "hearing" was postponed until March 27, 2014.

143.    To attend the hearing on March 27, Ms. Welch had to cancel a doctor's appointment.  With the assistance of her son, Ms. Welch made her way to Courtroom 478 using public transportation.

144.    ADA Dellafiora, on the other hand, failed to show at this "hearing."

145.    Ms. Welch was informed by Assistant District Attorney Clarence Dupree that the "hearing" was cancelled and she would have to return to Courtroom 478 on May 29, 2014.

146.    Ms. Welch was also told that while her son could be in the home during the day to assist her, he was not permitted to stay overnight.

147.    Although ADA Dupree informed Ms. Welch that she would receive a letter stating her son was permitted to remain in the home during the day, she never received this letter.

Despite repeated attempts to contact the Philadelphia D.A.'s Office, she was unable to get anyone on the phone to respond.

148.     Upon information and belief, there is no court order restraining Ms. Welch's son from her home.

149.     Upon information and belief, after this "hearing" concluded, ADA Dupree went to Courtroom 504 in the Criminal Justice Center and presented a proposed order temporarily restraining the property from being "sold, assigned, optioned, given, bequeathed, or transferred in any manner" for the pendency of the litigation.

150.     Judge Joan Brown signed the restraining order.

151.     On May 29, 2014, Ms. Welch, with the assistance of her son, again made her way on public transportation to Courtroom 478.  She brought with her a copy of the probate papers showing that she was one of the rightful heirs to her parents' estate.

152.     At this "hearing," ADA Dellafiora advised Ms. Welch that most likely the forfeiture action could be resolved without any complications if she would pay a fine.

153.     ADA Dellafiora also advised Ms. Welch that he would send her an email containing a "questionnaire" for her to complete.

154.     Upon information and belief, the "questionnaire" ADA Dellafiora was referencing is the same pattern form interrogatories received by Plaintiff Sourovelis.

155.     To date, Ms. Welch has not received the promised "questionnaire."

156.     At the May 29, 2014 hearing, ADA Dellafiora also informed Ms. Welch that her son would be able to stay overnight as the charges had been dismissed against him.  He promised to send Ms. Welch documentation of this.

157.     To date, Ms. Welch has not received any court order or letter from the

Philadelphia D.A.'s Office documenting the initial restraining order against her son or the lifting of that order.

158.    Because Ms. Welch was previously scheduled to be out of the country from mid-June through August 8, her forfeiture case was relisted for August 12, 2014.

159.    Ms. Welch has sustained irreparable injuries due to the threat of being evicted from her home without any notice or an opportunity to be heard.

160.    Ms. Welch has sustained irreparable injuries due to her son being temporarily barred from living in her home and suffers anxiety from the uncertainty as to whether Defendants will permanently bar her son from her home.

161.    Ms. Welch has also suffered hardship by being required to endure physical exertion to attend "hearings" in Courtroom 478 again and again at which she does not get an opportunity to be heard by a fair and neutral arbiter.

162.    Ms. Welch is also threatened with irreparable injury of losing her home which has been in her family for 17 years.

### C.    *Named Plaintiff Norys Hernandez*

163.    Plaintiff Norys Hernandez and her sister, Sonia Gonzalez, together own a rowhouse located at 3415 North Marshall Street, in which Sonia resided with her children.

164.    On April 17, 2014, Mrs. Hernandez's nephew was arrested outside 3415 North Marshall Street for selling and possessing a small amount of drugs.

165.    On or about June 2, 2014, Assistant District Attorney Steven Agami filed an *ex parte* application to seize and seal 3415 North Marshall Street.

166.    On June 2, 2014, the Court of Common Pleas entered an order authorizing Defendants to seize and seal the property.

- 29 -

167.    At the same time, ADA Agami filed an *ex parte* application for a restraining order restraining the sale, encumbrance, assignment, gifting, or transfer of the property.

168.    On or about June 2, 2014, Norys was informed that Defendants were pursuing civil forfeiture against the property and that, pursuant to the seize-and-seal order, no one could enter the property.

169.    At the time, Ms. Gonalzez was in Puerto Rico.  Accordingly, all of her clothing and personal effects remain in 3415 North Marshall Street, which she is still not allowed to enter.

170.    A "hearing" on the order to seize and seal the property, the restraining order, and the petition for forfeiture was set for June 12, 2014.

171.    At the "hearing" ADA Agami instructed Mrs. Hernandez to return to Courtroom 478 at the next listing with a copy of the deed and documentation of why Ms. Gonzalez needed to be let back into the house.

172.    The forfeiture case was relisted for August 12, 2014 for a "hearing" in Courtroom 478.

173.    Mrs. Hernandez suffers from irreparable injuries due to having her property seized and sealed without any notice or opportunity to be heard.

174.    Mrs. Hernandez is also threatened with the irreparable injury of losing her property.

**D.      *Plaintiff Members of the Class***

175.    These factual allegations pertaining to Plaintiffs Sourovelis, Welch, and Hernandez are similar to the experiences of other property owners in Philadelphia threatened with civil forfeiture.

176.    Defendants' policies and practices have caused members of the class extreme

- 30 -

hardship such as being left homeless or being left without needed medication after either it or the property housing the medication has been seized.

177.    Defendants' policies and practices have resulted in the entry of default judgments, entered without notice or due process of law, which cause the permanent loss of property.

178.    Defendants' policies and practices have forced property owners to evict friends and family members from living with them in order to have their properties unsealed and returned to them.

179.    Defendants' policies and practices have forced property owners to agree to waive statutory and constitutional defenses to potential forfeiture proceedings in the future in order to have their properties unsealed and returned to them.

180.    Defendants' policies and practices have forced property owners to repeatedly return to Courtroom 478 for "hearings" run by Defendants or else risk losing their property by a default judgment.

181.    Defendants' policies and practices have forced property owners to appear in Courtroom 478 for "hearings" that are run by Philadelphia prosecutors who have a direct financial interest in the outcome of the proceedings.

## CLASS ACTION ALLEGATIONS

182.    Named Plaintiffs Christos Sourovelis, Doila Welch, and Norys Hernandez seek to maintain this action on behalf of themselves and all others similarly situated under Rule 23(b)(2) of the Federal Rules of Civil Procedure.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

183.    The Named Plaintiffs propose the following class definition:  "all persons who own property that is or will be the subject of a civil-forfeiture action brought by the Philadelphia

D.A.'s Office."

184.   This action meets all the Rule 23(a) prerequisites of maintaining a class action.

185.   ***Numerosity under Rule 23(a)(1)***:  The putative class is so numerous that joinder of all members is impracticable.

      a.   In 2011 alone, the Philadelphia D.A.'s Office filed 6,560 civil-forfeiture cases.

      b.   Between June 1, 2014, and July 31, 2014, the Philadelphia D.A.'s Office listed 2,220 forfeiture cases for "hearings" in Courtroom 478 of City Hall.

186.   ***Commonality under Rule 23(a)(2)***:  This action presents questions of law and fact common to the putative class, resolution of which will not require individualized determinations of the circumstances of any particular plaintiff.  Common questions of fact include, but are not limited to:

      a.   Do Defendants have a policy and practice of seizing real property without providing property owners notice or an opportunity to be heard?

      b.   Do Defendants have a policy and practice of compelling property owners to sign agreements in which the owners waive statutory and constitutional defenses to unknown future forfeiture proceedings in order to have Defendants unseal their homes and other real property?

      c.   Do Defendants have a policy and practice of failing to provide prompt post-seizure hearings to individuals whose property has been seized?

      d.   Do Defendants have a policy and practice of repeatedly "relisting" forfeiture actions and requiring property owners to make monthly court appearances which increase the risk of a default judgment?

e.      Do the Law-Enforcement Defendants have a policy and practice of retaining all forfeited property and its proceeds?

f.      Do Defendants have a policy and practice of having assistant district attorneys control forfeiture proceedings in Courtroom 478?

Common questions of law include, but are not limited to, whether the above-described policies and practices violate the Due Process Clause of the Fourteenth Amendment.

187.   ***Typicality under Rule 23(a)(3)***:  The Named Plaintiffs' claims are typical of the claims of the putative class.

a.      The Named Plaintiffs' claims as well as those of the putative class members arise out of the same course of conduct by Defendants, are based on the same legal theories, and involve the same harms.

b.      Additionally, the Named Plaintiffs are seeking the same relief for themselves and members of the putative class.

188.   ***Adequacy of Representation under Rule 23(a)(4)***:  The interests of the putative class are fairly and adequately protected by the Named Plaintiffs and their attorneys.

a.      The Named Plaintiffs adequately represent the putative class because their interests are aligned and there are no conflicts of interest between the Named Plaintiffs and members of the putative class.

b.      The Named Plaintiffs and putative class members are ably represented *pro bono* by the Institute for Justice and local counsel David Rudovsky.  Founded in 1991, the Institute for Justice is a nonprofit, public-interest law firm that litigates constitutional issues nationwide.  The Institute for Justice has particular expertise in protecting property rights, including challenging civil-forfeiture programs on

constitutional grounds.  In bringing this action, the Institute for Justice has done

extensive work to identify and investigate Plaintiffs' claims.  David Rudovsky, a

founding partner of Kairys, Rudovsky, Messing & Feinberg, LLP, has practiced

for over forty years and has considerable experience in bringing class actions.

189.     This action also meets the requirements of, and is brought in accordance with

Rules 23(b)(2) of the Federal Rules of Civil Procedure.  Defendants have acted, or refused to act,

on grounds generally applicable to the class.  Final injunctive and declaratory relief is

appropriate with respect to all of the members of the class.

## CONSTITUTIONAL VIOLATIONS

### FIRST CLAIM FOR RELIEF:

### <u>FAILURE TO PROVIDE NOTICE OR A HEARING BEFORE SEIZING REAL PROPERTY VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT</u>

190.     Plaintiffs re-allege and incorporate by reference each and every allegation set

forth in ¶¶ 1 through 189 above.

191.     Defendants and their agents have seized and sealed the homes of Named Plaintiff

Christos Sourovelis and members of the putative class without providing notice or a meaningful

opportunity to be heard.

192.     Defendants and their agents have seized and sealed real property owned by

Named Plaintiff Norys Hernandez and members of the putative class without providing notice or

a meaningful opportunity to be heard.

193.     Defendants and their agents have applied for and received an order authorizing

them to seize and seal real property owned by Named Plaintiff Doila Welch and members of the

putative class without providing notice or a meaningful opportunity to be heard.

194.    Defendants have a policy and practice of relying on 42 Pa. Cons. Stat. § 6802(f) and (g) to seize real property without providing owners or residents of the property notice or a meaningful opportunity to be heard.

195.    Defendants have a policy and practice of obtaining *ex parte* orders to seize and seal real property without evidence that providing notice will jeopardize the availability of that particular property for forfeiture or any evidence of exigent circumstances that would justify sealing the real property.

196.    Defendants' policy and practice of seizing real property without providing notice or a meaningful opportunity to be heard violates the Due Process Clause of the Fourteenth Amendment.

197.    As a direct and proximate result of Defendants' actions, Plaintiffs Sourovelis and Hernandez and the members of the putative class have suffered irreparable injury to their constitutional rights, including but not limited to being forcibly evicted from their homes and having their real property seized.

198.    As a direct and proximate result of Defendants' policies and practices of seizing real property including homes without providing owners or residents notice or an opportunity to be heard, members of the putative class will suffer irreparable injury to their constitutional rights, including but not limited to being forcibly evicted from their homes or having their real property seized.

199.    Declaratory and injunctive relief is necessary to remedy Defendants' unconstitutional conduct of seizing real property without notice or a hearing.  Without appropriate declaratory and injunctive relief, Defendants' unconstitutional policies and practices will continue.

## SECOND CLAIM FOR RELIEF:

### REQUIRING REAL PROPERTY OWNERS TO WAIVE STATUTORY AND CONSTITUTIONAL DEFENSES IN FUTURE CIVIL-FORFEITURE PROCEEDINGS VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

200.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 199 above.

201.   After seizing and sealing the homes of Plaintiff Christos Sourovelis and members of the putative class on the basis of *ex parte* applications that deprive them of notice or an opportunity to be heard, Defendants and their agents require property owners to agree to certain conditions in order to re-enter their properties.

202.   Defendants have a policy and practice of requiring property owners to agree that should Defendants attempt to forfeit the property due to any future controlled-substance violations with a connection to the property, the property owner waives his rights to assert an innocent-owner defense under 42 Pa. Const. § 6802(j) or argue that forfeiture of the property would constitute an excessive fine.

203.   Defendants' policy and practice of requiring property owners to prospectively waive their statutory and constitutional rights in order to have their homes and other real property unsealed violates the Due Process Clause of the Fourteenth Amendment because it seeks to impair the property owners' access to the courts to assert their constitutional rights.

204.   Defendants' policy and practice of requiring property owners to prospectively waive their statutory and constitutional rights in order to have their homes and other real property unsealed violates the Due Process Clause of the Fourteenth Amendment because it unacceptably raises the risk of an erroneous deprivation, in that it would allow Defendants to forfeit the property no matter how innocent the property owner is or how disproportionate the

- 36 -

forfeiture would be in light of the gravity of the offense.

205.     Defendants' policy and practice of requiring property owners to prospectively

waive their statutory and constitutional rights in order to have their homes and other real

property unsealed violates the Due Process Clause of the Fourteenth Amendment because such a

waiver does not further any legitimate interest of Defendants.

206.     As a direct and proximate result of Defendants' actions, policies, and practices,

Plaintiff Sourovelis and members of the putative class have suffered injury to their constitutional

rights, including their right to contest future forfeiture proceedings Defendants pursue against

their real properties.

207.     Declaratory and injunctive relief is necessary to remedy Defendants'

unconstitutional practice of forcing property owners to waive their statutory and constitutional

rights in order to re-enter their homes.  Without appropriate declaratory and injunctive relief,

Defendants' unconstitutional policies and practices will continue.

### THIRD CLAIM FOR RELIEF:

### FAILURE TO PROVIDE A PROMPT, POST-DEPRIVATION HEARING VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

208.     Plaintiffs re-allege and incorporate by reference each and every allegation set

forth in ¶¶ 1 through 207 above.

209.     After seizing or restraining property for civil-forfeiture determinations,

Defendants and their agents failed to provide the Named Plaintiffs and members of the putative

class with a prompt hearing at which they would have been able to challenge, before a neutral

arbiter, the basis for the seizure, restraint, and/or indefinite retention of their property pending

the civil-forfeiture determination.

210.     Defendants have a policy and practice of seizing, restraining, or indefinitely

retaining property for civil forfeiture without providing property owners a prompt hearing at which they can challenge, before a neutral arbiter, the basis for the seizure, restraint, and/or indefinite retention of their property pending the civil-forfeiture determination.

211.   Defendants' policy and practice of failing to provide prompt post-deprivation hearings violates the Due Process Clause of the Fourteenth Amendment because it fails to give property owners a chance to contest the basis for the deprivation at a meaningful time and in a meaningful manner.

212.   As a direct and proximate result of Defendants' actions, policies, and practices, the Named Plaintiffs and members of the putative class have suffered irreparable injury to their constitutional rights, including but not limited to being deprived of their property without a meaningful opportunity to be heard.

213.   Declaratory and injunctive relief is necessary to remedy Defendants' unconstitutional conduct of seizing, restraining, and/or retaining property without a hearing. Without appropriate declaratory and injunctive relief, Defendants' unconstitutional policies and practices will continue.

## FOURTH CLAIM FOR RELIEF:

## REPEATEDLY "RELISTING" FORFEITURE PROCEEDINGS VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

214.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 213 above.

215.   Defendants have relisted forfeiture actions against property owned by the Named Plaintiffs multiple times, requiring the Named Plaintiffs to return to Courtroom 478 for each listing in order to preserve their interest in the property, or else risk losing their property forever through default judgment.

216.    Defendants have a policy and practice of relisting forfeiture actions, typically on a monthly basis, forcing members of the putative class to return to Courtroom 478 for each listing in order to preserve their interest in the property, or else lose their property forever through a default judgment.

217.    Upon information and belief, Defendants have a policy and practice of relisting forfeiture actions repeatedly until any underlying criminal case against anyone—including people other than the property's owners—is resolved rather than staying the forfeiture proceeding for the pendency of the criminal action.

218.    Defendants' policy and practice of relisting forfeiture actions violates the Due Process Clause of the Fourteenth Amendment because it imposes a high risk of erroneous deprivation of property.  The private interests affected by the "relisting" procedure outweigh Defendants' interests in maintaining the policy.

219.    As a direct and proximate result of Defendants' actions, policies, and practices, the Named Plaintiffs and members of the putative class have suffered irreparable injury by the violation of their constitutional rights.

220.    Declaratory and injunctive relief is necessary to remedy Defendants' unconstitutional conduct of repeatedly requiring Plaintiffs to appear for proceedings or else risk losing their property forever.  Without appropriate declaratory and injunctive relief, Defendants' unconstitutional policies and practices will continue.

## FIFTH CLAIM FOR RELIEF:

### THE RETENTION OF FORFEITED PROPERTY AND ITS PROCEEDS BY LAW-ENFORCMENT DEFENDANTS VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

221.    Plaintiffs re-allege and incorporate by reference each and every allegation set

forth in ¶¶ 1 through 220 above.

222.    The Law-Enforcement Defendants' policy and practice of retaining forfeited property and its proceeds injects a personal and institutional interest, financial and otherwise, into enforcing civil forfeiture that brings irrelevant and impermissible factors into the investigative and prosecutorial decision-making process and thereby creates actual bias, the potential for bias, and/or the appearance of bias.

223.    The Philadelphia D.A.'s Office—the very agency charged with prosecuting civil-forfeiture actions—has a direct financial incentive in the outcome of forfeiture proceedings because of the prospect of both economic profit through salaries as well as institutional gain through more and better law-enforcement equipment.

224.    D.A. Seth Williams—the very official charged with prosecuting civil-forfeiture actions—has a direct financial incentive in the outcome of forfeiture proceedings because of the prospect of both economic profit through salaries as well as institutional gain through more and better law-enforcement equipment.

225.    The Philadelphia D.A.'s Office has shared its forfeiture revenue with the Philadelphia Police Department.  Upon information and belief, this practice continues.

226.    Police Commissioner Ramsey—the very official charged with enforcing civil-forfeiture laws on behalf of the Philadelphia Police Department—has a direct financial incentive in seizing property for civil forfeiture due to, upon information and belief, the prospect of both economic profit through salaries as well as institutional gain through more and better law-enforcement equipment.

227.    The direct financial stake that these Law-Enforcement Defendants have in the seizure and retention of property for forfeiture poses a conflict of interest, the potential for bias,

and the appearance of bias that violate Plaintiffs' rights to the fair and impartial administration of justice guaranteed by the Due Process Clause of the Fourteenth Amendment.

228.    As a direct and proximate cause of the Law-Enforcement Defendants' actions, policies, and practices, Plaintiffs have suffered irreparable injury to their constitutional rights, including but not limited to the unjust taking of their property.

229.    Declaratory and injunctive relief is necessary to remedy the Law-Enforcement Defendants' conflict of interest.  Without appropriate declaratory and injunctive relief, the Law-Enforcement Defendants' unconstitutional policies and practices will continue.

## SIXTH CLAIM FOR RELIEF:

### DEFENDANTS' POLICY AND PRACTICE OF PROSECUTORS CONTROLLING COURTROOM 478 "HEARINGS" VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

230.    Plaintiffs re-allege and incorporate by reference each and every allegation set forth in ¶¶ 1 through 229 above.

231.    Defendants have a policy and practice of having prosecutors run the forfeiture proceedings in Courtroom 478, including but not limited to calling the cases, determining whether property owners are in default, and assessing whether any evidence produced by property owners is sufficient.

232.    These prosecutors, who are assistant district attorneys in the Public Nuisance Task Force of the Philadelphia D.A.'s Office, have a direct and institutional financial interest in the outcome of the forfeiture proceedings.

233.    Defendants' policy and practice of having prosecutors, with a direct and institutional financial interest in the outcome of the forfeiture proceedings, run those very same forfeiture proceedings, violates the Due Process Clause of the Fourteenth Amendment.

234.   As a direct and proximate result of Defendants' actions, policies, and practices, the Named Plaintiffs and members of the putative class have suffered irreparable injury to their constitutional rights.

235.   Declaratory and injunctive relief is necessary to correct Defendants' unconstitutional conduct of having those with a financial interest in the outcome of the proceedings run those proceedings.  Without appropriate declaratory and injunctive relief, Defendants' unconstitutional policies and practices will continue for the foreseeable future.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request, on behalf of themselves and all others similarly situated, this Court:

1.   For entry of judgment declaring as unconstitutional under the Due Process Clause of the Fourteenth Amendment:

a.   Defendants' policy and practice of seizing real property without providing property owners notice or an opportunity to be heard;

b.   Defendants' policy and practice of requiring real property owners whose property has been seized and sealed to waive their future statutory and constitutional defenses as a condition of having their properties unsealed;

c.   Defendants' policy and practice of failing to provide prompt, post-deprivation hearings to individuals whose property has been seized, restrained and/or indefinitely retained;

d.   Defendants' policy and practice of "relisting" forfeiture actions and requiring property owners to make monthly court appearances, or else risk losing their property forever through default judgments;

e.      Law-Enforcement Defendants' policy and practice of retaining all

forfeited property and its proceeds; and

f.      Defendants' policy and practice of having prosecutors, with a direct

financial interest in the outcome of civil-forfeiture proceedings, control the civil-

forfeiture "hearings" in Courtroom 478;

2.      For an entry of judgment declaring that the City of Philadelphia and the

Philadelphia District Attorney's Office is liable for the above-described unconstitutional policies

and practices.

3.      For entry of preliminary and permanent injunctions against Defendants

prohibiting them from engaging in the above-described policies and practices.

4.      For a court order declaring the following statutory provisions unconstitutional:

a.      42 Pa. Const. Stat. § 6802(f) and (g) are unconstitutional as applied to real

property to the extent these provisions authorize *ex parte* seizure of real

property, without notice or a pre-deprivation opportunity to contest the

seizure;

b.      42 Pa. Const. Stat. § 6801(b) is unconstitutional as applied to the extent it

allows the seizure of real property without fair judicial process;

c.      42 Pa. Const. Stat. §§ 6801 and 6802 are unconstitutional as applied to the

extent these provisions fail to provide for a prompt post-deprivation hearing for

any property;

d.      42 Pa. Const. Stat. § 6801(e)–(h) are unconstitutional as applied to the

extent they create a conflict of interest that denies individuals the fair and

impartial administration of justice.

5.      For a court order requiring Defendants to:

    a.  dismiss, with prejudice, all civil-forfeiture proceedings against property owned by the Named Plaintiffs and class members;

    b.  return all property seized from the Named Plaintiffs and class members;

    c.  remove all restraints imposed against the Named Plaintiffs' and class members' real property as a consequence of the forfeiture petition, including but not limited to any *lis pendens* notices;

6.      For an award of $1.00 in nominal damages for each of the six claims for relief. Plaintiffs seek this award for the class as a whole and do not request nominal damages for each class member;

7.      For an award of attorney's fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988(b); and

8.      For further legal and equitable relief as this Court may deem just and proper.

Dated:      August 11, 2014

Respectfully submitted,

By: *David Rudovsky / jms*
David Rudovsky

**INSTITUTE FOR JUSTICE**
William H. Mellor*
Scott G. Bullock*
Darpana M. Sheth*
Robert P. Frommer*
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682 – 9320
Fax: (703) 682 – 9321
E-mail: wmellor@ij.org; sbullock@ij.org; dsheth@ij.org; rfrommer@ij.org

**KAIRYS, RUDOVSKY, MESSING & FEINBERG LLP**
David Rudovsky
I.D. Number 15168
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
Tel: (215) 925 – 4400
Email: drudovsky@krlawphila.com

*Pro Hac Vice* applications to be submitted.