**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CHRISTOS SOUROVELIS, DOILA WELCH and NORYS HERNANDEZ, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Civil Action No.  14-4687 |
| vs. | Assigned to the Honorable Judge Robreno |
| CITY OF PHILADELPHIA; MICHAEL A. NUTTER, in his official capacity as Mayor of Philadelphia; PHILADELPHIA DISTRICT ATTORNEY'S OFFICE; R. SETH WILLIAMS, in his official capacity as District Attorney of Philadelphia; and CHARLES H. RAMSEY, in his official capacity as Commissioner of the Philadelphia Police Department; | Special Management Track |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION ON
PLAINTIFFS' FIRST CLAIM FOR RELIEF**

INSTITUTE FOR JUSTICE
William H. Mellor*
Scott G. Bullock*
Darpana M. Sheth*
Robert P. Frommer*
901 North Glebe Road, Suite 900
Arlington, VA 22203
wmellor@ij.org; sbullock@ij.org;
dsheth@ij.org; rfrommer@ij.org
Tel: (703) 682-9320
Fax: (703) 682-9321
*Admitted *Pro Hac Vice*

KAIRYS, RUDOVSKY, MESSING &
FEINBERG
David Rudovsky (I.D. Number 15168)
The Cast Iron Building
718 Arch Street
Suite 501 South
Philadelphia, PA 19106
drudovsky@krlawphila.com
Tel:  (215) 925-4400

*Counsel for Plaintiffs*

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................- 1 -

STATEMENT OF FACTS ......................................................................................- 2 -

I.    PHILADELPHIA SEIZES AND FORFEITS REAL PROPERTY ON AN UNPRECEDENTED
      SCALE ..............................................................................................- 2 -

II.   PLAINTIFFS SUFFER IRREPARABLE INJURY DUE TO DEFENDANTS' EX PARTE
      "SEIZE AND SEAL" POLICY.................................................................- 5 -

ARGUMENT ........................................................................................................- 8 -

I.    STANDARD OF REVIEW .......................................................................- 9 -

II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE DEFENDANTS'
      POLICY AND PRACTICE OF "SEIZING AND SEALING" REAL PROPERTY VIOLATES
      BINDING SUPREME COURT PRECEDENT ...............................................- 9 -

      A.   *United States v. James Daniel Good Real Property Holds That Due
           Process Requires Notice and an Opportunity for a Hearing Before
           Seizing Real Property* ............................................................- 10 -

      B.   *Philadelphia's "Seize and Seal" Program Flatly Violates James
           Daniel Good*............................................................................- 13 -

III.  PLAINTIFFS HAVE SUFFERED AND CONTINUE TO SUFFER IRREPARABLE HARM
      BY BEING DEPRIVED OF THEIR HOMES WITHOUT NOTICE OR AN OPPORTUNITY
      TO BE HEARD ....................................................................................- 15 -

IV.   GRANTING AN INJUNCTION WOULD NOT HARM DEFENDANTS AND WOULD BE
      IN THE PUBLIC INTEREST....................................................................- 16 -

V.    THE RULE 65(C) BOND REQUIREMENT SHOULD BE WAIVED BECAUSE THIS IS
      A PUBLIC-INTEREST LAWSUIT WITH NO RISK OF FINANCIAL LOSS FOR
      DEFENDANTS ....................................................................................- 18 -

CONCLUSION......................................................................................................- 19 -

## TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*ACLU v. Reno*, 217 F.3d 162 (3d Cir.2000) ................................................................. 17

*Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153 (3d Cir.1999) ................................ 16

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994) ......... 17

*Connecticut v. Doehr*, 501 U.S. 1 (1991) ..................................................................... 12

*Council of Alt. Political Parties v. Hooks*, 121 F.3d 876 (3d Cir. 1997) ...................... 17

*Elliott v. Kiesewetter*, 98 F.3d 47 (3d Cir. 1996) ........................................................ 19

*Fuentes v. Shevin*, 407 U.S. 67 (1972) ................................................................. 10,11

*Harmelin v. Michigan*, 501 U.S. 957 (1991) ............................................................... 12

*Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123 (1951) ........................ 12

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................................ 10, 11

*Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236 (3d Cir. 2011) ......................... 9

*Temple Univ. v. White*, 941 F.2d 201 (3d Cir. 1991) .................................................... 18

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) ................................. *passim*

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ...................................................................... 9

**Other Authorities**

Isaiah Thompson, *Law to Clean Up Nuisances Costs Innocent People Their Homes*, Pro Publica, Aug. 5, 2013, *available at* http://www.propublica.org/article/law-to-clean-up-nuisances-costs-innocent-people-their-homes/single#republish ..................................................... 2,3

Isaiah Thompson, *The Cash Machine*, Phila. City Paper, Nov. 28, 2012, *available at* http://citypaper.net/article.php?The-Cash-Machine-19189 (last visited Sept. 8, 2014) .. 2,3

## <u>INTRODUCTION</u>

"[The] right to maintain control over [one's] home, and to be free from governmental interference, is a private interest of historic and continuing importance."  *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53-54 (1993).  That is what the Supreme Court declared over twenty years ago when it held that, absent exigent circumstances, governments cannot seize homes or other real property without first giving owners notice and an opportunity to be heard. *Id*. at 62.

In blatant violation of this binding Supreme Court precedent, the City of Philadelphia and its law-enforcement officers routinely obtain and execute ex parte "seize and seal" orders that allow them to enter Philadelphians' homes, to force everyone living there to leave—often with only a few minutes to collect their personal belongings—and to prevent anyone from returning, in some cases by padlocking the doors and driving screws into the window frames.  As confirmed by court records for real-property forfeiture cases in which property owners appeared in Courtroom 478 over the last three months, the Philadelphia District Attorney's Office has a practice and policy of requesting seize and seal orders in virtually every real-property forfeiture case.  As averred in Plaintiffs' Complaint's first claim for relief,[1] Philadelphia's "seize and seal" scheme evicts property owners from their homes without giving them any notice or any ability to be heard by a judge.

Plaintiffs' motion can be resolved through a straightforward application of black-letter law.  The Supreme Court decided this issue more than 20 years ago in *James Daniel Good*.  The City of Philadelphia is openly flouting this precedent.  To prevent the irreparable harm that Defendants' "seize and seal" policy imposes, this Court must declare Defendants' seize and seal

---

[1]  Plaintiffs move for a preliminary injunction on only the first of their six claims for relief.  Plaintiffs' remaining claims require further factual development.

policy unconstitutional and preliminarily enjoin Defendants and their agents from seizing real property without first providing affected owners with notice and an opportunity to be heard before a neutral arbiter.

## STATEMENT OF FACTS

**I.   PHILADELPHIA SEIZES AND FORFEITS REAL PROPERTY ON AN UNPRECEDENTED SCALE.**

Philadelphia's civil-forfeiture program is enormous.  In 2011 alone, the Philadelphia District Attorney's Office filed 6560 petitions seeking to forfeit property that it believed to be connected to a crime.[2]  By comparison, Allegheny County (the second largest county in Pennsylvania, where Pittsburgh is located) filed roughly 200 civil forfeiture petitions from 2008-2011.[3]  Many of the Philadelphia forfeiture petitions involve homes, businesses, and other types of real property.  The Philadelphia District Attorney's Office initiates forfeiture proceedings against 300 to 500 private residences each year, forfeiting 100 or more properties.[4]  A significant majority of the remaining real property forfeiture proceedings "settle" under threat of forfeiture with property owners either forced to sell the home and split the proceeds with the District Attorney's Office or to agree to bar relatives from their homes and waive their legal rights in any future forfeiture proceeding or selling.  In 2010, the Philadelphia District Attorney's Office forfeited 90 houses and auctioned 119 real properties bringing in $1.2 million in revenue.[5]  Based on reports obtained from Pennsylvania's Attorney General, from 2002 to 2012, the City of Philadelphia forfeited 1172 real properties compared to just 56 real properties by all other Pennsylvania counties combined.  (*See* Declaration of Darpana M. Sheth ("Sheth Decl.") ¶ 2.)

---

[2]  Isaiah Thompson, *The Cash Machine*, Phila. City Paper, Nov. 28, 2012, *available at* http://citypaper.net/article.php?The-Cash-Machine-19189.
[3]  *Id.*
[4]  Isaiah Thompson, *Law to Clean Up Nuisances Costs Innocent People Their Homes*, Pro Publica (Aug. 5, 2013), http://www.propublica.org/article/law-to-clean-up-nuisances-costs-innocent-people-their-homes/single#republish.
[5]  *Id.*

The City's large-scale forfeiture process is made possible by a mechanized, assembly-line system operated by a handful of prosecutors within a specialized unit of the Philadelphia District Attorney's Office called the Public Nuisance Task Force.  When the Philadelphia District Attorney's Office begins civil-forfeiture proceedings against real properties, it relies on prosecution assistants, paralegals, and support staff within the Public Nuisance Task Force to copy information from thousands of Philadelphia Police Department Arrest Reports onto three sets of form legal documents.[6]  The first is the forfeiture petition, which identifies who owns the property according to the Philadelphia Real Estate Directory and simply states that the Commonwealth is seeking forfeiture of the real property "because it was used and/or continues to be used (or intended to be used) to commit, or to facilitate the commission of" violations of the Controlled Substance, Drug, Device and Cosmetic Act.  (*See* Sheth Decl., Ex. 2.)  Factual details on the events giving rise to the forfeiture action appear either in the petition itself or, more typically, in the arrest report that Defendants attach to the petition.  (*Id.*)

Along with the forfeiture petition, the Philadelphia District Attorney's Office typically files two additional documents:  a motion for a restraining order and an application to seize and seal the property.  (*See* Sheth Decl., Exs. 3 & 4.)  Both motions are filed ex parte.[7]  (*See id.*)  The ex parte motion for a temporary restraining order seeks to restrain the property owner from selling, transferring, or otherwise encumbering the property so as to protect the government's interest in the property while the forfeiture proceeding is underway.  (*See* Sheth Decl., Ex. 3.)

---

[6] Isaiah Thompson, *The Cash Machine*, Phila. City Paper, Nov. 28, 2012, *available at* http://citypaper.net/article.php?The-Cash-Machine-19189.

[7] Defendants claim the authority to file these documents under two provisions of the Controlled Substances Forfeiture Act.  42 Pa. Cons. Stat. §§ 6801-6802 (2014).  The first, Section 6801(b), states that "[p]roperty subject to forfeiture . . . may be seized by the law enforcement authority upon process issued by any court of common pleas having jurisdiction over the property."  The second is Section 6802(f), which states that courts may take steps to "preserve the availability of property . . . for forfeiture."  The Act goes on to say that ex parte orders are permissible "if the Commonwealth demonstrates that there is probable cause to believe . . . that provision of notice will jeopardize the availability of the property for forfeiture."  *Id.* at § 6802(g).

Plaintiffs do not at this time challenge these motions for a restraining order, notwithstanding the fact that they are typically granted without any further evidentiary showing by the prosecutors and usually on the same day they are presented.  (*See* Sheth Decl., Exs. 3 & 5.)  Once entered, the assistant district attorney files the restraining order with the prothonotary, requesting that the property be indexed as a *lis pendens*.  (*See* Sheth Decl., Ex. 7.)

The second document, an ex parte application to "seize and seal" the real property, is even more intrusive.  Unlike the motion for a temporary restraining order, which seeks to prevent a property's transfer, these applications seek permission to forcibly enter the home or other real property, evict everyone living there, and then seal the property to prevent re-entry, often by padlocking the front door and nailing the doors and windows shut.  Applications for seize and seal orders contain only general, boilerplate bare allegations that the Commonwealth is moving for forfeiture of the property, that the assigned assistant district attorney believes that Pennsylvania law authorizes such an order, and that seizing the property will prevent "further narcotics activity from occurring within."  (*See* Sheth Decl., Ex. 4.)  In form language, these applications rotely ask that the order be entered without notice or a hearing to, among other things, "avoid a prolonged confrontation"—although the application does not provide any specific facts about why such a confrontation would ensue.  (*See id*.)  In any event, just as with the motions for temporary restraining orders, these "seize and seal" applications are routinely approved without any further evidentiary showing, and usually on the day it is first presented. (*See* Sheth Decl., Ex. 6.)

Applying for a seize and seal order is by no means an unusual practice the Philadelphia District Attorney's Office reserves only as a last resort for specific properties.  Rather, the District Attorney's Office routinely applies for seize and seal orders whenever it pursues civil

forfeiture against homes or other real properties.  (*See* Sheth Decl., ¶ 3 & Ex. 1.)  As part of its

case investigation, counsel for Plaintiffs have reviewed 24 active and recently listed cases where

the District Attorney's Office is seeking to forfeit a home, apartment, or some other type of real

property.  (*See* Sheth Decl., ¶ 3.)  All 24 cases were listed for a "hearing" in Courtroom 478 in

the last three months, and in all of these cases property owners appeared at the hearing to contest

the forfeiture.  (*See id.*)  In 22 of those cases, the District Attorney's Office applied for an ex

parte seize and seal order.  (*See* Sheth Decl., ¶ 3 & Ex. 1.)

For the hundreds of Philadelphia homeowners ensnared in Defendants' civil-forfeiture

machine, the first time they learn their home is threatened with forfeiture is when officers of the

Philadelphia Police Department arrive at their doorstep, armed with a seize and seal order to

throw them out on the street.  As the experiences of Named Plaintiffs show, Defendants' seize

and seal policy comes at a devastatingly high cost.

## II.   PLAINTIFFS SUFFER IRREPARABLE INJURY DUE TO DEFENDANTS' EX PARTE "SEIZE AND SEAL" POLICY.

Named Plaintiffs Christos Sourovelis and Norys Hernandez as well as other real property

owners have suffered irreparable harm due to Defendants' ex parte "seize and seal" policy.

### A.   CHRISTOS SOUROVELIS

Christos Sourovelis and his wife Markela own a home in Northeast Philadelphia where

they live with their two daughters (13 and 25 years old) and until recently, their youngest son (22

years old).  (Declaration of Markela Sourovelis ("Sourovelis Decl."), ¶ 2 & Ex. 1.)  On March

27, 2014, Philadelphia police came to Mr. Sourovelis' home and arrested his youngest son for

selling $40 dollars of drugs outside the home to a confidential informant.  (Sourovelis Decl.,

¶¶ 3-4.)  Because his son had never been in trouble with the law before, he was allowed to enter

a drug rehabilitation program, and Mr. and Mrs. Sourovelis believed the worst to be behind them.  (Sourovelis Decl., ¶ 6.)

But the two would soon learn how wrong they were.  On May 7, 2014, the Philadelphia District Attorney's Office began civil-forfeiture proceedings against the Sourovelises' home even though there was no suggestion that either Mr. or Mrs. Sourovelis had anything to do with the drug crimes.  (Sourovelis Decl., ¶ 7 & Ex. 3.)  Indeed, neither had ever been in trouble with the law before.  As appears to be its standard operating procedure, the District Attorney's Office also applied for a "seize and seal" order at the same time it filed the forfeiture petition and a motion for a temporary restraining order.  (Sourovelis Decl., Exs. 3-6.)  The "seize and seal" application merely recounted the circumstances surrounding the arrest; it did not describe why the temporary restraining order would be insufficient or why letting the Sourovelises explain why they should not be thrown out of their home would threaten the government's interests.  (Sourovelis Decl., Ex. 4.)  The same day, both the restraining order and the "seize and seal" order were entered.  (Sourovelis Decl., Exs. 5-6.)

The following day, Mr. Sourovelis was driving his son to begin his residential drug rehabilitation program when he received a frantic call from his wife.  Officers from the Philadelphia Police Department had unexpectedly come to the home and ordered the family out of their home pursuant to the "seize and seal" order.  (Sourovelis Decl., ¶ 7.)  Suddenly made homeless, Mr. and Mrs. Sourovelis, along with their two daughters, were forced to sleep on the sofas of their eldest son for an entire week, suffering numerous hardships.  (Sourovelis Decl., ¶¶ 8-9).

A week later at the Courtroom 478 proceeding, Mr. and Mrs. Sourovelis were coerced into signing a document that would allow them and their two daughters to return home, but only

- 6 -

if they agreed to keep their youngest son from returning and waived, in any future forfeiture proceedings, their innocent owner defense or their ability to challenge the forfeiture as disproportionate or an excessive fine.  (Sourovelis Decl., ¶¶ 12-13, Exs. 7-8.)  Desperate, and without the assistance of counsel, Mr. Sourovelis and his wife reluctantly signed the agreement. It took three to four more days after Mr. and Mrs. Sourovelis signed the agreement to get the damage repaired from screws and bolts on the doors and windows from the sealing of the home and to get the power, water and other utilities—which the City of Philadelphia had turned off— running again.  (Sourovelis Decl. ¶ 14.).

### B.  NORYS HERNANDEZ

Norys Hernandez and her sister, Sonia Gonzalez, together own a row house in North Philadelphia.  Up until Defendants' actions giving rise to this lawsuit, Ms. Gonzalez resided in the home with her children, with Ms. Hernandez living a few doors down the block.  On April 17, 2014, Ms. Gonzalez's son was arrested outside the row house for selling and possessing a small amount of drugs.  (Sheth Decl., Ex. 2.)

As the criminal case against Ms. Gonzalez's son proceeded, the Philadelphia District Attorney's Office initiated civil-forfeiture proceedings against the rowhouse.  On June 2, 2014, the District Attorney's Office filed a forfeiture petition, a temporary restraining order, and an ex parte application to seize and seal the home.  (*See* Sheth Decl., Exs. 2-4.)  In language identical to that in dozens of other applications, Defendants summarily stated that the property "was used and/or continues to be used" to violate the Controlled Substances Act and that it should be seized to "prevent[] further narcotics activity from occurring within."  (*See* Sheth Decl., Ex. 2.)  Just as with the Sourovelises, both the restraining order and the "seize and seal" order were entered the same day.  (*See* Sheth Decl., Exs. 1, 5 & 6.)

Philadelphia police executed the "seize and seal" order in short order, padlocking the front door to the home.  Ms. Hernandez first learned about the order only once it had been executed, when she was told that the District Attorney's Office was pursuing civil forfeiture against the rowhouse and that, under the "seize and seal" order, neither she nor anyone else could enter it.  Because Sonia Gonzalez was in Puerto Rico when officers of the Philadelphia Police Department executed the order, she has been unable to retrieve any of her clothes or personal effects.  For almost three months, neither Ms. Hernandez nor her sister have entered the house, let alone lived in it or even been able to rent it out to others to offset expenses incurred by being kicked out of their property.  Ms. Gonzalez and the rest of her family have been forced to stay with friends while she and her sister fight to retain the home.

## ARGUMENT

Defendants' practice and policy of routinely seizing peoples' homes without giving affected owners or residents any prior notice or opportunity to be heard violates the U.S. Constitution and U.S. Supreme Court precedent.  In *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993), the Court expressly held that—absent exigent circumstances—the Due Process Clause requires the government to provide owners notice and an opportunity to be heard before it seizes their real property.  But Philadelphia flouts this constitutional command by filing hundreds of "seize and seal" applications every year that contain no particularized explanation of why pre-seizure notice is not required or why seizure is the only way to safeguard the government's interest in the property during the pending forfeiture proceeding.

This Court should protect the sanctity of the home and the rule of law by enjoining Defendants' unconscionable and unconstitutional "seize and seal" policy.  Plaintiffs are entitled to preliminary injunction because Defendants' routine practice of seizing homes without giving

owners notice and an opportunity to be heard violates binding Supreme Court precedent. Moreover, the severe deprivation caused by the ex parte seizure of one's home constitutes irreparable harm, as does the violation of one's constitutional rights.  Further, enjoining Defendants from violating those rights is both equitable and will serve the public interest. Finally, because this is a public-interest lawsuit that seeks declaratory and injunctive relief, and only nominal damages, and therefore does not pose any financial risk to Defendants, this Court should waive the bond requirement of Federal Rule of Civil Procedure 65(c).

## I.    STANDARD OF REVIEW

Plaintiffs request this Court to preliminarily enjoin Defendants from applying for and enforcing orders to seize and seal homes and other real property without first providing owners with notice and an opportunity to be heard.  The four factors that govern the issuance of a preliminary injunction are:  (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of preliminary relief; (3) the balance between that harm and the harm that relief would cause to other litigants; and (4) the public interest.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 249-50 (3d Cir. 2011).  In this case, each factor weighs in favor of granting a preliminary injunction.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE DEFENDANTS' POLICY AND PRACTICE OF "SEIZING AND SEALING" REAL PROPERTY VIOLATES BINDING SUPREME COURT PRECEDENT.

Plaintiffs are likely to prevail on their challenge to Defendants' "seize and seal" policy because that practice violates the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.  For over twenty years, a bedrock principle of constitutional law has been that when the government wishes to seize one's home or other real property as part of a civil-forfeiture proceeding, it must first provide the owner of that property with notice and an

opportunity to be heard.  But Defendants' "seize and seal" program routinely flouts that basic requirement, with the result that hundreds if not thousands of Philadelphians lose both their homes and their constitutional rights.

> **A.**     ***United States v. James Daniel Good Real Property* Holds That Due Process Requires Notice and an Opportunity for a Hearing Before Seizing Real Property.**

When the government seeks to take someone's property, due process requires that it provide property owners with notice and a timely opportunity to be heard by a neutral magistrate. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (stating that "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner'" (internal citation omitted)).  These hearings give owners an opportunity to explain why the government does not have sufficient reason to seize their property or hold onto it.  *See, e.g.*, *Fuentes v. Shevin*, 407 U.S. 67, 97 (1972) (holding that hearing must provide court with "the validity, or at least the probable validity of the underlying claim" before claimant is deprived of property (internal citation omitted)).  Prompt hearings are constitutionally necessary in part because they minimize the risk that owners will be erroneously deprived of their property during the pendency of the underlying proceeding.  *Fuentes*, 407 U.S. at 81 (stating that due process requirement of notice and hearing is to prevent "substantively unfair and simply mistaken deprivations of property interests").

The U.S. Supreme Court has held that when the government wishes to seize real property, like Plaintiffs' homes, due process requires it to provide owners with notice and an opportunity for a hearing *before* any seizure occurs.  In *United States v. James Daniel Good Real Property*, the federal government sought to forfeit a house after its owner pleaded guilty to state drug crimes.  510 U.S. 43, 46-47 (1993).  Just like Defendants, federal officials asked for and

received an order that allowed them to take control of Good's home without first providing him with any notice or an opportunity to be heard by a judge. *Id*. at 47.

The Supreme Court held that the government's practice of securing and executing ex parte seizure warrants violated the Constitution. In so doing, the Court analyzed the government's policy using *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), which looks at (1) the private interest affected by the government's practice of ex parte seizure of real property; (2) the risk that ex parte seizure will cause innocent owners to be erroneously deprived of their property; and (3) the government's interests, including the administrative burden that providing property owners with additional protections would impose. *James Daniel Good*, 510 U.S. at 53.

The Court held that all three *Mathews* factors weighed in favor of requiring pre-seizure notice. Regarding the first factor, the Court called the right to maintain control over the home a "private interest of historic and continuing importance," *id*. at 53-54, and noted that it previously had ruled that due process required pre-seizure notice for much less vital types of property interests like kitchen appliances and household furniture. *Id*. at 54 (citing *Fuentes*, 407 U.S. at 70-71). Moreover, the government's seizure of Good's house profoundly interfered with that private interest, by depriving Good of the right to live in the property if he wished, rent it out if he did not, and modify the property as he saw fit. *Id*. The Court concluded that "[i]n sum, the private interests at stake in the seizure of real property weigh heavily in the *Mathews* balance." *Id*. at 55.

Turning to the second *Mathews* factor, the Court held that the government's policy of executing seizure warrants without first providing homeowners notice or a hearing "creates an unacceptable risk of error" that "affords little or no protection to the innocent owner." *Id*. at 55. Since the federal government sought these orders on an ex parte basis, the court deciding

whether to grant them only hears one side of the story—the government's.  It did not, and indeed could not, hear any arguments or construe any evidence about whether the homeowner is innocent or has other valid defenses to the forfeiture.  *Id*.  This, as the Court noted, simply did not suffice:  "[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . .  No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it."  *Id*. (quoting *Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170–72 (1951) (Frankfurter, J., concurring) (footnotes omitted)).  The fact that the federal law-enforcement agencies moving to forfeit Good's home had a direct financial interest in the outcome of the proceedings only reinforced the need for a pre-seizure adversary hearing.  *Id*. at 55-56 (citing *Harmelin v. Michigan*, 501 U.S. 957, 979 n.9 (1991) (opinion of Scalia, J.) ("[I]t makes sense to scrutinize governmental action more closely when the State stands to benefit[.]").

Furthermore, the fact that a homeowner may ultimately have his or her house returned provided the Supreme Court with little comfort.  Once the government executed the seizure warrant, affected homeowners would have to wait until a final hearing to press their case, which may not occur "until many months after the seizure."  *Id*. at 56.  Even if an innocent homeowner did ultimately prevail in the forfeiture proceeding, he or she still would suffer grievously due to "the temporary deprivation that an earlier hearing might have prevented."  *Id*. (quoting *Connecticut v. Doehr*, 501 U.S. 1, 15 (1991)).

Lastly, the Court held there was no pressing need that would have justified an exception from the usual requirement that the government provide notice before seizing one's property.  *Id*. at 53 (stating that exceptions to pre-seizure notice available only in "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after

the event" (internal quotation marks omitted)).  First, unlike a yacht, automobile, or other personal property, which "might have disappeared had the Government given advance warning of the forfeiture action," *id*. at 57, homes and other forms of real property cannot abscond from the jurisdiction.  Second, the government could satisfy its purported interests in preventing the property from being sold, destroyed, or used for further illegal activity without seizing the property.  *Id*. at 58.  The federal government, for instance, could prevent a home's sale by filing a *lis pendens* when it commences the forfeiture proceeding.  *Id*.  It could execute search and arrest warrants at the property to prevent further illegal activity.  *Id*. at 59.  And if the government had actual evidence that the owner of a particular property might destroy his or her home, it could seek to prevent that destruction by obtaining a temporary restraining order.  *Id*. at 58-59.  Unless the government presents evidence that these measures will not sufficiently protect its interests with respect to a particular property, it must give the property's owner notice and an opportunity to be heard.  *Id*. at 62.

> ## B.     *Philadelphia's "Seize and Seal" Program Flatly Violates James Daniel Good*.

The rule from *James Daniel Good* is clear:  Due process requires the government to give owners notice and an opportunity for a hearing before it seizes their homes and other real properties.  510 U.S. at 62.  Defendants' "seize and seal" policy wholly contravenes that requirement and violates both the due process and property rights of hundreds of the City's real-property owners.

The Philadelphia District Attorney's Office routinely files ex parte seizure applications for real property at the same time it initiates forfeiture proceedings.  A review of 24 civil-forfeiture cases involving real property reveals that the District Attorney's Office moved for an ex parte seizure order in 22 of those cases, or almost 92 percent of the time.  (*See* Sheth

Decl., ¶ 3 & Ex. 1.)  Furthermore, not one of these 22 applications to seize and seal contain any particularized information about why ex parte seizure was necessary.  (*See* Sheth Decl., ¶ 3.) Rather, the applications contain only boilerplate allegations that (1) the Commonwealth is moving for forfeiture of the property; (2) Pennsylvania state law authorizes Defendants to seize and seal property; (3) seizing and sealing the property will "protect[] the health and safety of the community by immediately preventing further narcotics activity from occurring within"; and (4) providing notice to the property owner would lead to a "prolonged confrontation," would endanger the "ability [sic][8] of the property for the forfeiture," and would create a "risk of injury to all parties."  (*See* Sheth Decl., Ex. 6.)

These conclusory and generic allegations cannot suffice.  The Court in *James Daniel Good* noted that for the government to seize real property without affording pre-seizure notice and a hearing, it must demonstrate that "less restrictive measures—*i.e.*, a *lis pendens*, restraining order, or bond—would not suffice to protect the Government's interests."  510 U.S. at 62. Defendants typically ask for and receive these less restrictive measures, which Plaintiffs do not seek to enjoin, when they commence civil-forfeiture proceedings, yet they do not explain why these measures are not enough.  And Defendants have the power, should they be concerned that criminal activity may occur at a particular home or other residence, to "forestall further illegal activity with search and arrest warrants obtained in the ordinary course."  *James Daniel Good*, 510 U.S. at 59.  In other words, Defendants have the full panoply of tools they need to protect their interests.  Before they can constitutionally secure a seize and seal order, they must show why a particular property presents an "extraordinary situation[,]" *id*. at 53, where those tools will fall short.

---

[8]  This typographical error (the correct word would be "availability") appears in numerous seize and seal applications filed by Defendants, further demonstrating that these applications are simply duplications, rather than justified on a case by case basis.

Defendants' "seize and seal" applications do not attempt to make such a showing, nor could they given the hundreds of applications that Defendants file each and every year. Defendants' policy of applying for and executing ex parte "seize and seal" orders therefore violates the procedural due process requirements of the Fourteenth Amendment. As explained below, Defendants' "seize and seal" program injures not only Plaintiffs' and other Philadelphia real-property owners' constitutional rights, but the very sanctity of their homes. Defendants' unconstitutional actions have quite literally thrown entire families out onto the streets.

### III. PLAINTIFFS HAVE SUFFERED AND CONTINUE TO SUFFER IRREPARABLE HARM BY BEING DEPRIVED OF THEIR HOMES WITHOUT NOTICE OR AN OPPORTUNITY TO BE HEARD.

Defendants' ex parte seize and seal program has violated and continues to violate the constitutional rights of Named Plaintiffs Sourovelis, Hernandez, Welch, and other Philadelphians whose homes are being threatened with civil forfeiture. But it has a more immediate and visceral effect, in that it deprives property owners of the continued use and enjoyment of their homes.

As the Supreme Court noted in *James Daniel Good*, the right to maintain control over one's home, and to be free from governmental interference, is a private interest of historic and continuing importance. 510 U.S. at 53-54. Defendants' execution of ex parte "seize and seal" orders deprives Plaintiffs and other real property owners of their valuable rights of ownership, including their right to live in their homes, to use and enjoy them as they see fit, and to invite others to do the same. For instance, Ms. Hernandez and her sister Sonia Gonzalez have been unable, for three months, to enter the house that they own. The Sourovelises were thrown out of their home for over a week and able to return only by barring their youngest son from the home—even though they desperately want him there to ensure he stays on the straight and narrow.

- 15 -

The unnamed members of the class likewise suffer due to Defendants' unconstitutional actions.  Those who occupy their own home surely suffer as much as Ms. Gonzalez and the Sourovelises, as do landlords whose properties have been seized and sealed due to activities their tenants conducted without their knowledge or consent.  *See James Daniel Good*, 510 U.S. at 54 (rejecting argument that landlord's interest in home was limited to only foregone rents and holding that "even if this were the only deprivation at issue, it would not render the loss insignificant or unworthy of due process protection").  An order by this Court enjoining Defendants from applying for ex parte "seize and seal" orders is necessary to prevent this irreparable harm.

## IV.  GRANTING AN INJUNCTION WOULD NOT HARM DEFENDANTS AND WOULD BE IN THE PUBLIC INTEREST.

Issuing an injunction that prevents Defendants from applying for and executing seize and seal orders obtained without notice will not harm Defendants, let alone subject them to greater harm than Plaintiffs and other class members.  *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999) (stating that balance of harm element of preliminary-injunction test asks "whether granting preliminary relief will result in even greater harm to the nonmoving party").

Defendants cannot credibly claim that enjoining their ability to execute these ex parte orders would threaten their ability to ensure their interests in the property during the forfeiture proceedings.  First, as discussed above, these civil-forfeiture actions concern land and buildings, fixed properties and structures that simply cannot abscond from the jurisdiction.  Second, just as the Supreme Court concluded in *James Daniel Good* that the federal government had ample tools to secure its legitimate interests without resorting to ex parte seizure, so too do Defendants.  For virtually every real property Defendants seek to forfeit, they seek and secure a *lis pendens* to prevent the property from being sold, transferred, or otherwise encumbered.  Should Defendants

learn that a property owner wishes to damage or destroy his home—an unlikely occurrence, given that one's home is often his or her single most valuable asset—they can seek a restraining order from the state court.  And to the extent that criminal activity occurs at a residence or other real property, the Philadelphia Police Department and District Attorney's Office can secure search and arrest warrants in the usual course of business.

Moreover, an injunction would not leave Defendants flat-footed should they become aware of an extraordinary situation where all of those tools would be insufficient to protect their interests vis-à-vis a specific property.  In that instance, Defendants could petition the Court of Common Pleas for an ex parte seizure warrant based on actual evidence.  It is unclear, given all of this, how Defendants will be harmed by being enjoined from seeking ex parte orders in virtually every single real-property forfeiture case they file.

Granting the injunction would also be in the public interest, as it would protect the constitutional rights of hundreds of Philadelphia property owners.  *See ACLU v. Reno*, 217 F.3d 162, 180-81 (3d Cir. 2000) ("[N]either the government nor the public generally can claim an interest in the enforcement of an unconstitutional law." (internal citation omitted)); *Council of Alt. Political Parties v. Hooks*, 121 F.3d 876, 883–84 (3d Cir. 1997) (holding that "[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights").  Moreover, because Plaintiffs have demonstrated both that they are likely to succeed in their challenge to Defendants' "seize and seal" policy, and because that program works an irreparable injury on hundreds of real property owners each year, an injunction should properly issue.  *See Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of

success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.").

## V.   THE RULE 65(C) BOND REQUIREMENT SHOULD BE WAIVED BECAUSE THIS IS A PUBLIC-INTEREST LAWSUIT WITH NO RISK OF FINANCIAL LOSS FOR DEFENDANTS.

Having established that Plaintiffs are entitled to a preliminary injunction, the only remaining question is the amount, if any, of the security Plaintiffs must provide under Federal Rule of Civil Procedure 65(c).  Although the Rule's language provides that federal courts may issue preliminary injunctions only if the applicant provides a bond, the Third Circuit has recognized that a bond may be waived in specific circumstances.  *Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991).  Courts determine whether those circumstances exist by considering whether the application seeks to enforce a significant federal right or a matter of public interest and by comparing "the possible loss to the enjoined party . . . with the hardship that a bond requirement would impose on the applicant."  *Id.* at 220 (internal citation omitted).

Both of these considerations weigh in favor of waiving the Rule 65(c) bond requirement.  First, the purpose of Plaintiffs' lawsuit is to enforce the constitutional rights of Philadelphia property owners—particularly, their constitutional right to due process—which Defendants' civil-forfeiture program violates as a matter of course.  And Plaintiffs' motion for preliminary injunction seeks to end one of the most flagrantly unconstitutional aspects of that program:  its systemic use of secret procedures to throw people out of their homes without any notice or opportunity to be heard.

Second, requiring Plaintiffs to pay a bond in order to secure their constitutional rights would amount to an undue hardship and would unduly interfere with the enforcement of their due-process rights.  *Temple Univ.*, 941 F.2d at 220.  This motion for preliminary injunction is brought on behalf of a putative class of numerous Philadelphians who have had their homes and

- 18 -

other real property seized without due process of law.  Many members of this class are of modest means and this public-interest lawsuit has arisen only due to Plaintiffs' counsel offering their services *pro bono* in this case.  Moreover, as discussed above, the financial risk to Defendants from having their unconstitutional "seize and seal" policy enjoined is non-existent.  *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996) (stating that "[w]here the balance of these equities weighs overwhelmingly in favor of the party seeking the injunction, a district court has the discretion to waive the Rule 65(c) bond requirement").

## CONCLUSION

"Individual freedom finds tangible expression in property rights."  *James Daniel Good*, 510 U.S. at 61.  Defendants' ex parte "seize and seal" policy flouts the Court's decision in *James Daniel Good* and unconstitutionally tears away the security and privacy of hundreds of homeowners every year.  *See id.* ("At stake in this and many other forfeiture cases are the security and privacy of the home and those who take shelter within it.").  Plaintiffs respectfully request that this Court declare Defendants' "seize and seal" policy unconstitutional under the Due Process Clause of the Fourteenth Amendment and preliminarily enjoin Defendants and their agents from applying for and executing "seize and seal" orders for real property without first providing affected owners with notice and an opportunity to be heard.

Dated:          September 8, 2014

Respectfully submitted,
By:     /s/ Darpana M. Sheth

INSTITUTE FOR JUSTICE
William H. Mellor*
Scott G. Bullock*
Darpana M. Sheth*
Robert P. Frommer*
901 N. Glebe Road, Suite 900

KAIRYS, RUDOVSKY, MESSING & FEINBERG LLP
David Rudovsky
I.D. Number 15168
The Cast Iron Building
718 Arch Street, Suite 501 South

Arlington, VA 22203                          Philadelphia, PA 19106
Tel:  (703) 682 – 9320                       Tel:  (215) 925 – 4400
Fax:  (703) 682 – 9321                       Email:  drudovsky@krlawphila.com
E-mail:  wmellor@ij.org; sbullock@ij.org;
dsheth@ij.org; rfrommer@ij.org

*Admitted *Pro Hac Vice*.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 8th day of September, 2014, a true and correct copy of

this MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION ON

PLAINTIFFS' FIRST CLAIM FOR RELIEF was served upon the following counsel of record

by electronic mail to:

Dimitrios Mavroudis
City of Philadelphia Law Department
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
Tel:  (215) 683-5444
Email:  dmitrios.mavroudis@phila.gov

*Attorney for Defendants City of Philadelphia, Mayor Michael A. Nutter,*
*and Police Commissioner Charles H. Ramsey*

Elizabeth J. Rubin
Office of the District Attorney
Three South Penn Square
Philadelphia, PA 19107
Tel:  (215) 686-8787
Email:  bj.graham-rubin@phila.gov

*Attorney for Defendants Philadelphia District Attorney's Office and*
*District Attorney R. Seth Williams*

INSTITUTE FOR JUSTICE

/s/  Darpana M. Sheth
Darpana M. Sheth

*Attorney for Plaintiffs*