IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOS SOUROVELIS, et al., | : | CIVIL ACTION |
| | : | No. 14-4687 |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | |
| | : | |
| Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                    JANUARY 27, 2021

## Table of Contents

I. BACKGROUND ................................................................ 3
  A.  Factual Background and Procedural History .......................... 3
  B.  The Proposed Class Action Settlement ............................... 7
    1. The Class ........................................................ 8
    2. The Proposed Terms of the Consent Decree ......................... 8
II. DISCUSSION ............................................................... 11
  A.  Whether Class Certification Is Proper ............................. 12
    1. Rule 23(a) Factors ............................................... 13
      a.  Numerosity ................................................... 13
      b.  Commonality .................................................. 14
      c.  Typicality ................................................... 15
      d.  Adequacy of Representation ................................... 16
    2. Rule 23(b)(3) Factors ............................................ 18
    3. Ascertainability ................................................. 21
  B.  Whether Notice to the Class Members Was Reasonable ................ 22
  C.  Whether the Proposed Settlement Is Fair ........................... 22
    1. The Girsh Factors ................................................ 25
      a.  The Complexity, Expense, and Likely Duration of the Litigation ... 25
      b.  The Reaction of the Class to the Settlement .................. 25
      c.  The Stage of the Proceedings and the Amount of Discovery Completed 26
      d.  The Risks of Establishing Liability .......................... 27
      e.  The Risks of Establishing Damages ............................ 27

    f.   The Risks of Maintaining the Class Action Through Trial .......... 28

    g.   The Ability of the Defendants to Withstand a Greater Judgment .... 28

    h.   The Range of Reasonableness of the Settlement Fund ............... 28

  2.  The Prudential Factors ........................................... 29

  3.  The Rule 23(e)(2) Factors ........................................ 32

    a.   Whether the Class Representatives and Class Counsel Have Adequately Represented the Class ........................................... 32

    b.   Whether the Proposal Was Negotiated at Arm's Length ............. 32

    c.   Whether the Relief Provided for the Class Was Adequate ......... 33

    d.   Whether the Proposal Treats Class Members Equitably Relative to Each Other ........................................................... 33

  4.  The Fairness of the Monetary Award Structure and the Cy Pres Provision 36

III. CONCLUSION......................................................... 41

This is a case about long standing policies and procedures of the City of Philadelphia, the Office of the District Attorney, and the Court of Common Pleas of Philadelphia County concerning the adjudication and execution of civil forfeitures. The Court found those policies and procedures, as alleged by the Plaintiffs and taken as true, to be unconstitutional and to have caused harm to Plaintiffs. Plaintiffs seek class certification, injunctive relief, and monetary compensation. After substantial discovery and motion practice and with the help of a court appointed facilitator, the parties have reached agreement as to class certification, the implementation of structural and administrative changes in the manner in which civil forfeiture proceedings are conducted by the District Attorney and the Court of Common Pleas, and an

amount of money sufficient to fairly compensate the victims of the unconstitutional practices.

Presently before the Court is "Plaintiffs' Consent Motion and Memorandum in Support of Final Approval of Class Certification and Consent Decree on Plaintiffs' Fifth and Sixth Claims for Relief." If approved, the settlement would resolve the two claims that assert the right to monetary restitution (the "Restitutionary Claims"). There is a second consent decree involving the Third, Fourth, Sixth, and Seventh Claims for Relief that concerns structural changes to the Defendants' policies and practices (the "Courtroom Claims") and which is the subject of a separate memorandum issued on this day. Finally, there is a separate order containing findings and granting an award of attorneys' fees.

For the reasons that follow, the Court will grant the motion in part, certify the class, and approve a class action settlement as described in this memorandum. The parties may then file a joint modified consent decree for the Restitutionary Claims which conforms with this decision.

I.   **BACKGROUND**

A.   Factual Background and Procedural History

Four residents of the city of Philadelphia ("Plaintiffs") filed their suit on August 11, 2014 on behalf of

3

all real and personal property owners whose property has been subject to civil-forfeiture proceedings in Philadelphia. Plaintiffs sued the City of Philadelphia, the District Attorney's Office, and the First Judicial District of Pennsylvania (together referred to as "Defendants")[1] alleging that the forfeiture proceedings used in Philadelphia violated constitutional due process guarantees. Plaintiffs allege that the Defendants utilized "robo-forfeiture" practices involving issuing large amounts of generic forfeiture complaints which resulted in the seizure of more than 1,200 houses, 3,500 vehicles, and $50 million in cash over thirteen years. Plaintiffs allege that, instead of being able to challenge the forfeitures before a judge, they were forced to plead their case before prosecutors from the District Attorney's Office, the very individuals who had issued the complaints. Plaintiffs further allege that instead of the forfeiture assets being used to help communities combat drugs (the professed goal of the forfeiture program), the Defendants used the funds to pay themselves and to pay for substantial purchases outside of City Council appropriations, creating significant conflicts of interest. The

---

[1]      Although each of the Defendants acted separately and independently of each other and consequently not all conduct found to be unconstitutional applies to all Defendants, for the sake of clarity, this memorandum refers to "Defendants" jointly regardless of which Defendant engaged in the unconstitutional conduct, except where specific reference to the District Attorney's Office is relevant and helpful.

Court found that the Plaintiff had stated a cause of action and that, as alleged, the Defendants' conduct, policies, and procedures were unconstitutional. See Sourovelis v. City of Phila., 246 F. Supp. 3d 1058 (E.D. Pa. 2017); Sourovelis v. City of Phila., 103 F. Supp. 3d 694 (E.D. Pa. 2015).

After nearly six years of litigation during which the parties engaged in significant motion practice including three motions to dismiss, two motions to compel, and a motion for preliminary injunction, and after the certification of one subclass, a court-approved settlement of two counts in November 2015, and the negotiation of the current proposed settlement, the Court preliminarily certified the class at issue and preliminarily approved the Consent Decree on April 30, 2019 after a hearing.

Thereafter, notice was provided to the class members as dictated by the Court, including posting the notice on a purpose-specific website and on the respective websites of class counsel and the Defendants, and sending individualized notices to nearly 35,000 potential class members to the most up-to-date addresses available. Counsel sought and received an extension for the claims period when it discovered additional means by which to obtain accurate mailing addresses. Counsel also contacted by telephone more than 200 class members, handed out the notice and attendant forms during forfeiture proceedings,

and widely publicized the settlement and claims process on local and social media. Ultimately, the Claims Administrator received 2,395 claims that counsel concluded were eligible for awards and received only fifteen opt-outs. By December 6, 2019, the deadline for objections, only nine objections had been filed. Two of those simply ask for counsel to contact them.

On October 14, 2020, the Court held a final fairness hearing. The Court granted the opportunity for all present to comment, but only counsel and the parties' witnesses spoke. The Court also considered the few submitted written objections, which it then denied. There were no other objections to the proposed class action and settlement of the Restitutionary Claims. The Court, however, questioned the fairness of the large cy pres award, which turned out to be 27% of the $3 million Restitutionary Fund. This amount could not have been known during the preliminary approval because, although the amount of the total award was fixed, the number of claimants was then unknown.

The Court ordered the parties to submit further briefing which, inter alia: (1) calculated the effects of increasing the reward to each class member along with recommended increases; (2) provided a clarification of how many claims fell into each of the award categories; and (3) outlined the proposed distribution of the remaining cy pres funds.

On November 16, 2020, the parties submitted these supplemental letter briefs. However, they did not agree on how to redistribute the cy pres funds. On December 12, 2020, the Court reconvened the final fairness hearing telephonically in order to discuss the competing proposals. Having considered the new proposals, the Court, as the arbiter of the fairness of the cy pres distribution, concludes that class counsel's suggestion, as discussed below, provides the fairest distribution of the remaining funds. The Court therefore approves a settlement that includes class counsel's distribution model.

Regarding the two claims at issue in this memorandum, the Fifth Claim for Relief challenges the Defendants' retention and use of forfeited property and its proceeds. Plaintiffs assert that this policy gave law enforcement in Philadelphia a direct financial interest in the outcome of forfeiture proceedings. The Sixth Claim for Relief challenges Defendants' practice of allowing prosecutors, rather than neutral arbiters, to control forfeiture and related proceedings in Courtroom 478 of City Hall. Plaintiffs seek the return of their forfeited property and monetary relief for the alleged constitutional violations.

B.    <u>The Proposed Class Action Settlement</u>

The terms of the proposed class action settlement are set forth in the "Proposed Consent Decree on Plaintiffs' Fifth

and Sixth Claims for Relief" ("Consent Decree"). Mot. Ex. A, ECF

No. 331-1. The basic terms are outlined below.

### 1.   The Class

The so-called "Restitutionary Class" is comprised of:

> All persons who held or hold legal title to, or
> otherwise had or have a legal interest in property
> against which a Statutory or Common Law civil-
> forfeiture petition (i) was pending in the Court of
> Common Pleas of Philadelphia County as of August 11,
> 2012; or (ii) was filed in the Court of Common Pleas
> of Philadelphia County on or after August 11, 2012
> until the date the Court grants preliminary approval.

Id. at 8.

### 2.   The Proposed Terms of the Consent Decree

The Consent Decree offers two main benefits to the

proposed Restitutionary Class: (1) complete injunctive relief

remedying the Defendants' direct financial interest in the

outcome of forfeiture proceedings; and (2) a Restitutionary Fund

of $3 million to be administered by a third-party claims

administrator. Including certain time-barred claims that the

parties agreed to incorporate in the final tally,[2] there were

only 2,395 valid claimants out of the nearly 35,000 potential

class members who were sent notice of the lawsuit. The final

---

[2]      These time-barred claimants will technically be paid
out of the cy pres fund since they are not actually class
members. For purposes of discussion in this memorandum, however,
the Court will include these individuals and their awards with
the class member calculations, and when the Court refers to the
cy pres fund, it will be referring to the remaining cy pres
funds after these individuals have been compensated.

claimant count includes 61 claimants whose cases are not fully adjudicated, so the parties, not knowing the ultimate value of those claims, have set aside enough funds to compensate them. The Court will retain jurisdiction over the permanent injunctions in the Consent Decree for as long as they are in place.[3]

According to the proposed Consent Decree, the Restitutionary Fund will consist of $3 million, which after paying the costs of administration, will be distributed in the following order:

First, $90 would be paid to each member of the proposed Restitutionary Class as recompense for the alleged constitutional violations. Second, each named Plaintiff would receive an incentive award of $2,500. Third, class members who were neither convicted nor received a diversionary disposition in a criminal case associated with the forfeiture of their property would receive 100% of the value of their property ("Innocent Claimants"). Fourth, class members who received a diversionary disposition in the criminal case associated with the forfeiture of their property would receive 75% of the value

---

[3]      Whether this jurisdiction will be maintained after a reasonable period of time will depend upon the parties' performance under the terms of the Consent Decree. It is not the intention of the Court for a federal court to permanently, or for an extended period, superintend over the state court of common pleas or the state's civil process.

of their property ("Diversionary Claimants"). Fifth, those claimants who were convicted in the criminal case associated with the forfeiture of their property would receive 0% of the value of their property ("Convicted Claimants"). Sixth, $375,000 would be returned to the City of Philadelphia.

Any remaining money would constitute a cy pres fund awarded to the Philadelphia Foundation to be distributed to nonprofit or community-based public-service organizations or social agencies. Due to the relatively low claim rate, 27% of the settlement fund, or $807,315 of the $3 million fund, ultimately fell within this category.

After the Court questioned the size of this large cy pres award, the parties agreed that it should be adjusted so the actual class members receive a greater share of the Restitutionary Fund.

In its supplemental letter brief, class counsel suggested: (1) the Innocent Claimants receive $800 (instead of $90) and 100% of the value of their forfeited property; (2) the Diversionary Claimants receive $600 (instead of $90) and 75% of the value of their forfeited property; and (3) the Convicted Claimants receive $200 (instead of $90) and 0% of the value of their forfeited property. This distribution maximizes payment to the class and leaves only .8%, or $24,000, for the cy pres award to the Philadelphia Foundation.

In the Defendants' supplemental letter brief, the District Attorney's Office suggested: (1) the Innocent Claimants receive $300 (instead of $90) and 100% of the value of their forfeited property; (2) the Diversionary Claimants receive $200 (instead of $90) and 75% of the value of their forfeited property; and (3) the Convicted Claimants receive the original $90 payment and 0% of the value of their forfeited property. This distribution would leave 21%, or $629,000 for the cy pres award to the Philadelphia Foundation. As discussed below, the Court concludes that class counsel's proposal is more consistent with the essential purpose of cy pres awards.

The Consent Decree also provides for an award of attorneys' fees and expenses of $2,630,000 in addition to the $3,000,000 restitution award. The reasonableness of attorneys' fees will be the subject of a separate order.

## II. DISCUSSION

Under Federal Rule of Civil Procedure 23(e), the settlement of a class action requires court approval. Fed. R. Civ. P. 23(e)(2). A district court may approve a settlement agreement "only after a hearing and only on finding that it is fair, reasonable, and adequate." Id. The factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. In re Hydrogen Peroxide Antitrust

Litig., 552 F.3d 305, 320 (3d Cir. 2008). "The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions, 148 F.3d 283, 299 (3d Cir. 1998) (quoting Girsh v. Jepson, 521 F.2d 153, 156 (3d Cir. 1975)).

The Court must also certify the settlement class. While the exact process a district court should follow when presented with a settlement class is not prescribed by Rule 23, under Third Circuit law, the court must determine that the settlement class meets the requirements for class certification under Rule 23(a) and (b), and must separately determine that the settlement is fair to that class under Rule 23(e). In re Nat'l Football League Players Concussion Inj. Litig., 775 F.3d 570, 581 (3d Cir. 2014) ("In re Nat'l Football League I"); In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 778 (3d Cir. 1995) (providing that settlement class status "should not be sustained unless the record establishes, by findings of the district judge, that the [ ]requisites of [ ] Rule [23(a) and (b)] are satisfied").

A.   Whether Class Certification Is Proper

At the final fairness stage, the court must undertake a "rigorous analysis" as to whether class certification is appropriate. In re Nat'l Football League I, 775 F.3d at 582-83,

12

586. Under Rule 23(a), the plaintiffs must demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

Rule 23(b)(3), under which Plaintiffs seek class certification for this Consent Decree, requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Finally, in addition to the Rule 23(a) and (b)(3) requirements, the Third Circuit imposes another requirement, ascertainability of the class, that must be assessed during the Court's determination on class certification.

      1.   <u>Rule 23(a) Factors</u>

         a.   <u>Numerosity</u>

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named

13

plaintiff demonstrates that the potential number of plaintiffs exceeds forty, the numerosity prong has been met. Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001).

Numerosity is easily satisfied here since the proposed settlement class has tens of thousands of members.

b.   Commonality

Rule 23(a)(2) requires a showing of the existence of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This commonality element requires that the plaintiffs "share at least one question of fact or law with the grievances of the prospective class." Rodriguez v. Nat'l City Bank, 726 F.3d 372, 382 (3d Cir. 2013) (quoting Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994)). To satisfy the commonality requirement, class claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution--which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).

The Fifth Claim for Relief presents the following common legal and factual questions "capable of classwide resolution": (1) how the proceeds of civil-forfeiture actions are distributed; (2) whether the manner in which the proceeds are distributed creates a conflict of interest; (3) whether that

conflict of interest deprives litigants in civil-forfeiture proceedings of due process of law; and (4) whether an order enjoining the City and District Attorney Defendants' retention of forfeiture proceeds, and declaring the City and District Attorney Defendants' practices unconstitutional, would provide relief for the due-process violation. The Sixth Claim for Relief presents the common questions of whether prosecutors acted essentially like judges in running Courtroom 478 and whether that violated Plaintiffs' due-process rights to an impartial and neutral arbiter.

Thus, the commonality requirement is met.

c.   Typicality

Rule 23(a)(3) requires that the class representatives' claims be "typical" of the claims of the class. Fed. R. Civ. P. 23(a)(3). The typicality inquiry is "intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." Baby Neal, 43 F.3d at 57. Where claims of the representative plaintiffs arise from the same alleged wrongful conduct on the part of the defendant, the typicality prong is satisfied. In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004). The typicality

threshold is low. <u>Seidman v. Am. Mobile Sys., Inc.</u>, 157 F.R.D. 354, 360 (E.D. Pa. 1994).

This element is satisfied because each of the Named Plaintiffs personally experienced the policies and practices that these claims challenged. Each class member suffered the same policy of using forfeiture proceeds to raise revenue, and each suffered the same policy of being subject to the alleged "sham" forfeiture proceedings conducted by Defendants. Moreover, each of the Named Plaintiffs' claims rest on the same legal theories as the unnamed class members' claims.

d.   <u>Adequacy of Representation</u>

Rule 23(a)(4) requires representative parties to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement "serves to uncover conflicts of interest between the named parties and the class they seek to represent." <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 625 (1997). The Third Circuit applies a two-prong test to assess the adequacy of the proposed class representatives. First, the court must inquire into the "qualifications of the counsel to represent the class," and second, it must assess whether there are "conflicts of interest between named parties and the class they seek to represent." <u>In re Prudential</u>, 148 F.3d at 312 (internal quotation marks omitted).

Regarding the qualifications of counsel, Fed. R. Civ. P. 23(g) provides that, in appointing class counsel, the court must consider: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources that counsel will commit to representing the class.

As it concluded during the preliminary approval process, the Court again concludes that Plaintiffs' counsel, the Institute for Justice and local counsel David Rudovsky, have substantial experience litigating forfeiture class actions nationwide and possess sufficient knowledge regarding the relevant law. Counsel have also performed a substantial amount of work in the case and have committed extensive resources without seeking interim payment. Specifically, counsel, inter alia, performed extensive pre-filing investigations, including multiple interviews of potential plaintiffs; conducted legal research regarding various procedural and substantive issues; researched, drafted, and amended the complaint; opposed three motions to dismiss; achieved certification of a Rule 23(b)(2) class with respect to injunctive and declaratory relief for Claim Five; conducted extensive discovery, including reviewing large amounts of forfeiture data and monitoring the forfeiture

proceedings; prepared and filed two motions to compel the production of discovery; participated in several settlement conferences, including an all-day session with a court-approved facilitator[4]; and successfully navigated the preliminary approval process.

Second, the Named Plaintiffs' interests are coextensive with, and not antagonistic to, the interests of the class since they all raise the same claims and seek the same relief: return of forfeited property or the value thereof. The Court concludes that there are no conflicts of interest between the Named Plaintiffs and the class such that the adequacy of representation requirement is met.

In sum, Plaintiffs have demonstrated compliance with each of the Rule 23(a) prerequisites for class certification.

2.   Rule 23(b)(3) Factors

In addition to satisfying each of the prerequisites in Rule 23(a), a class representative must show that the action falls into at least one of the three categories provided in Rule 23(b). Plaintiffs seek certification of these claims under Rule 23(b)(3). Under Rule 23(b)(3), a class action may be maintained

---

[4]      Mark A. Aronchick, a Philadelphia-based attorney experienced in class actions and commercial litigation, and also knowledgeable of local conditions and culture, was appointed by the Court with the consent of the parties as facilitator. To Mr. Aronchick goes the appreciation of the Court for helping the parties reach an agreement in this case.

if: (1) common questions of law or fact predominate over questions affecting only individual members; and (2) a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, 521 U.S. at 623. Further, it assesses whether a class action "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." Fed. R. Civ. P. 23(b)(3), Advisory Committee's Note to 1966 Amendment.

The superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." In re Warfarin, 391 F.3d at 533-34 (internal quotation marks omitted). Fed. R. Civ. P. 23(b)(3) lists four factors a court must consider when determining whether the proposed class action is superior to other alternatives: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in

managing a class action. However, when assessing superiority and
"[c]onfronted with a request for settlement-only class
certification, a district court need not inquire whether the
case, if tried, would present intractable management problems, .
. . for the proposal is that there be no trial." Amchem, 521
U.S. at 620.

Here, common issues predominate the Restitutionary
Class' claims. The Defendants maintained a generally applicable
policy of funding their own activities with forfeiture revenue
and having prosecutors run forfeiture proceedings in Courtroom
478. The question of liability thus relies on evidence that is
common to all class members, like whether there was a "common
course of conduct" regarding the retention of forfeiture
proceeds and prosecutorial control of forfeiture proceedings.

The superiority requirement is also satisfied. The
individual class members' claims are likely to be relatively
small, so that any one class member would have little interest
in prosecuting the case. According to Plaintiffs, in a random
sample of more than a hundred currency-forfeiture cases from
2011 to 2012, the median amount of cash subject to forfeiture
was only $178 and forfeiture records show sums as little as
$9.00 being ordered forfeited. Moreover, the Court is unaware of
any other lawsuits that are challenging the practices at issue
here. Finally, because most of the class members are

concentrated in Philadelphia, a class action on their behalf is appropriate in the Eastern District of Pennsylvania.

Therefore, the Court concludes that Plaintiffs have also demonstrated compliance with each of the Rule 23(b)(3) prerequisites for class certification.

### 3. Ascertainability

In addition to the Rule 23(a) and (b)(3) requirements, the Third Circuit imposes another requirement under Rule 23: ascertainability. Byrd v. Aaron's Inc., 784 F.3d 154, 163 (3d Cir. 2015). In Byrd, the Third Circuit explained that "[t]he ascertainability inquiry is two-fold, requiring a plaintiff to show that: (1) the class is defined with reference to objective criteria, and (2) there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." Id. (internal quotation marks and citation omitted).

The Restitutionary Class is ascertainable because the class definitions explain clearly who is part of the class. Moreover, Defendants' forfeiture proceedings records are an objective means of ascertaining the class members.

Based on the above, the settlement class satisfies the requirements of Rule 23(a) and (b)(3), as well as the Third Circuit's ascertainability requirement. Therefore, the Court shall certify the Restitutionary Class.

B.    Whether Notice to the Class Members Was Reasonable

As described above, the Court previously approved the notice scheme and it appears that the parties have successfully followed that procedure. Indeed, the parties have taken various additional measures to encourage maximum response. Therefore, the Court concludes that notice was reasonable. See Harris v. Reeves, 761 F. Supp. 382, 393 (E.D. Pa. 1991) ("[T]he trial court has broad discretion in determining the timing and manner" of class notice.).

C.    Whether the Proposed Settlement Is Fair

In approving a class action settlement, the court must determine whether the proposed settlement is fair, reasonable, and adequate, as required by Rule 23(e)(2). In re Prudential, 148 F.3d at 316-17. Where the parties simultaneously seek certification and settlement approval, the Third Circuit requires "'courts to be even more scrupulous than usual' when they examine the fairness of the proposed settlement." Id. at 317 (quoting In re Gen. Motors Corp., 55 F.3d at 805). This heightened standard is designed to ensure that class counsel has demonstrated sustained advocacy throughout the course of the proceedings and has protected the interests of all class members. Id. Ultimately, "[t]he decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district court." Girsh, 521 F.2d at 156. There

22

is a presumption of fairness for a settlement negotiated at arm's length by experienced advocates following sufficient discovery whenever the settlement has not drawn meaningful objections from class members. In re Cendant Corp. Litig., 264 F.3d 201, 232 n.18 (3d Cir. 2001). In that this is the posture of the case, the presumption applies.[5]

Rule 23(e)(2) sets forth the factors a court must consider in determining the fairness of a class action settlement. Specifically whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats

---

[5]     Arguably, applying this "presumption" in cases where the parties seek certification and settlement approval contemporaneously is in tension with the mandate from the Court of Appeals that courts are to act as fiduciaries to the class, independently and scrupulously evaluating the terms of the settlement regardless of the parties' positions. See, e.g., In re Cendant Corp., 264 F.3d at 231; In Re Prudential, 148 F.3d at 317. In this case, with or without applying the presumption, the Court finds the settlement to be fair.

class members equitably relative to each other. Fed. R. Civ. P. 23(e)(2).

These factors are in many respects a codification of various factors set forth in Girsh, 521 F.2d at 157, which the Third Circuit has directed courts to use in establishing the fairness of a class action settlement.[6] The Third Circuit later expanded on the Girsh factors in In re Prudential, 148 F.3d at 323, adding additional factors that the court may consider where appropriate.[7] In re Nat'l Football League Players Concussion

---

[6]       The Girsh factors are: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. Girsh, 521 F.2d at 157.

[7]       The Prudential factors are: (1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; (2) the existence and probable outcome of claims by other classes and subclasses; (3) the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved--or likely to be achieved--for other claimants; (4) whether class or subclass members are accorded the right to opt out of the settlement; (5) whether any provisions for attorneys' fees are reasonable; and (6) whether the procedure for processing individual claims under the settlement is fair and reasonable. In re Prudential, 148 F.3d at 323.

<u>Injury Litig.</u>, 821 F.3d 410, 437 (3d Cir. 2016) ("<u>In re Nat'l</u>
<u>Football League II</u>").

      The Court will address the relevant <u>Girsh</u>, <u>Prudential</u>,
and Rule 23(e)(2) factors below.

      1.   <u>The Girsh Factors</u>

         a.   <u>The Complexity, Expense, and Likely Duration</u>
             <u>of the Litigation</u>

      The first <u>Girsh</u> factor is "intended to capture 'the
probable costs, in both time and money, of continued
litigation.'" <u>In re Gen. Motors Corp.</u>, 55 F.3d at 812 (quoting
<u>Bryan v. Pittsburgh Plate Glass Co. (PPG Indus., Inc.)</u>, 494 F.2d
799, 801 (3d Cir. 1974)). The Court concludes, given the time
and expense already expended on the claims at issue, that if the
litigation continued, the costs, of both time and money, would
be significant. For example, the continued litigation would
entail additional discovery, including depositions, additional
motions on class certification, summary-judgment briefing, and
potentially trial. Weighing this risk against the relief
afforded in the Consent Decree, the Court concludes that this
factor supports approval of the Consent Decree.

         b.   <u>The Reaction of the Class to the Settlement</u>

      In relation to the second <u>Girsh</u> factor, when the
objectors are few and the class members many, there is a strong
presumption in favor of approving the settlement. <u>See, e.g.</u>, <u>In</u>

re Cendant Corp., 264 F.3d at 235 ("The vast disparity between
the number of potential class members who received notice of the
[s]ettlement and the number of objectors creates a strong
presumption that this factor weighs in favor of the
[s]ettlement."). Here, the parties sent the class notice to
approximately 35,000 potential class members and received over
2,300 claims. However, there were only nine objections. Of those
objections, only four took issue with the Restitutionary Fund or
how it is to be distributed. One of those four objected to the
eligibility dates but was ultimately included in the claimant
count. While the Court denied the objections during the hearing,
its acceptance of class counsel's redistribution of the cy pres
fund would likely have mooted them in any event as they sought
additional money. Finally, only fifteen individuals opted out of
the class. Therefore, this factor also weighs in favor of the
Consent Decree.

        c.   <u>The Stage of the Proceedings and the Amount
            of Discovery Completed</u>

      The third <u>Girsh</u> factor considers whether the parties'
attorneys have an "adequate appreciation of the merits of the
case before negotiating" the settlement. <u>In re Gen. Motors
Corp.</u>, 55 F.3d at 813. Here, counsel have engaged in significant
motion practice and the attendant investigation and research
over the last six years. There is no question that they are well

26

versed in the merits of the case. Therefore, this factor weighs in favor of the Consent Decree.

### d.   The Risks of Establishing Liability

Here, the Consent Decree, as accepted by the Court, provides for significant monetary compensation as well as full injunctive relief. The Court balances this against the uncertainties of dispositive motions practice and trial, and concludes that fourth Girsh factor weighs in favor of the Consent Decree.

### e.   The Risks of Establishing Damages

The fifth Girsh factor balances the "potential damage award if the case were taken to trial against the benefits of an immediate settlement." In re Nat'l Football League II, 821 F.3d at 439 (quoting In re Prudential, 148 F.3d at 319). Constitutional litigation is a "complex and . . . risky" endeavor. Boone v. City of Philadelphia, 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009). Even though the value of seized and forfeited property can be calculated through the District Attorney's forfeiture records, full restitution of Plaintiffs' property would not be guaranteed at trial. In light of the uncertainty in proving the amount of damages, the Court concludes that this factor weighs in favor of the Consent Decree.

f.    The Risks of Maintaining the Class Action
      Through Trial

     The Court concludes that the sixth Girsh factor is

neutral since there are no particular signs that the certified

class for this Consent Decree could not be maintained throughout

the suit. See Ripley v. Sunoco, Inc., 287 F.R.D. 300, 313 (E.D.

Pa. 2012) (finding that this Girsh factor was neutral where

"there [wa]s no apparent reason why the [c]ourt would decertify

or modify [a] class at any time during the litigation").

g.    The Ability of the Defendants to Withstand a
      Greater Judgment

     "The seventh Girsh factor is most relevant when the

defendant's professed inability to pay is used to justify the

amount of the settlement." In re Nat'l Football League II, 821

F.3d at 440. Cities are typically short of revenue to fund

competing priorities and Philadelphia is no exception. The Court

concludes that the Consent Decree adequately compensates the

class members without creating a financial emergency for the

City or depriving its citizens of needed municipal services.

Thus, the Court concludes that this factor favors the Consent

Decree.

h.    The Range of Reasonableness of the
      Settlement Fund

     The eighth and ninth factors are the range of

reasonableness of the settlement fund in light of the best

28

possible recovery and the attendant risks of litigation. These factors examine "whether the settlement represents a good value for a weak case or a poor value for a strong case." In re Warfarin, 391 F.3d at 538. Plaintiffs have strong constitutional claims in this case, however, the exact amount of damages is uncertain. The Consent Decree provides many of the class members 75% to 100% of the value of what was forfeited. Under the payment structure approved by the Court, all class members will also receive a fixed monetary payment to compensate them for the alleged constitutional violations. The Court concludes that a Consent Decree with these terms is a "good value" and that these factors weigh in favor of approval.

The Court concludes that the Girsh factors favor approving the Consent Decree.

### 2. The Prudential Factors

Again, the non-mandatory Prudential factors are: (1) the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; (2) the existence and probable outcome of claims by other classes and subclasses; (3) the comparison between the results achieved by the settlement for individual

class or subclass members and the results achieved--or likely to be achieved--for other claimants; (4) whether class or subclass members are accorded the right to opt out of the settlement; (5) whether any provisions for attorneys' fees are reasonable; and (6) whether the procedure for processing individual claims under the settlement is fair and reasonable. In re Prudential, 148 F.3d at 323.

The first Prudential factor has been discussed within the Girsh factors. It weighs in favor of the Consent Decree as discussed above.

The second factor asks whether other classes or subclasses are getting a better deal. See, e.g., Vista Healthplan, Inc. v. Cephalon, Inc., No. 06-CV-1833, 2020 WL 1922902, at *23 (E.D. Pa. Apr. 21, 2020) (finding that settlement satisfied this factor because "there do not appear to be any disparities in the success of the settlements obtained by the various claimants"). In this case, all members of the Restitutionary Class are also receiving the benefits of the only other sub-classes, the Injunctive Classes for the Courtroom Claims, which are discussed in a separate memorandum. Therefore, this factor weighs in favor of the Consent Decree.

The third factor is not relevant because there are no other claimants other than the individual class members.

The fourth factor supports approval of the Consent Decree because class members were given the opportunity to exclude themselves from the Restitutionary Class and not be bound by the Consent Decree.

The fifth factor also favors approval. As discussed in a separate order granting counsel's unopposed fee petition, the Court has concluded that counsel's fees are reasonable. Counsel seek $2,630,000 in attorneys' fees to be paid separately from and in addition to the $3 million settlement fund. The number of hours for which they are seeking compensation, 9,800, are reasonable given the complexity and length of this case.[8] Their rates are also reasonable for this geographic area. Ultimately, Counsel has sought twenty percent less than the lodestar and have forgone payment for many hours of work.

The sixth factor supports approval of the Consent Decree because the method for processing claims is fair and reasonable. As discussed above, all class members will receive monetary payments and, in addition, the Innocent Claimants will receive 100% of the value of their forfeited property and the Diversionary Claimants will receive 75% of the value of their property. The claims are also processed by an experienced Claims

---

[8]     Counsel reported to the Court that they will continue to represent the Plaintiffs and class members in the litigation after class certification and approval of the Consent Decree and during the enforcement aspects of the case, and that they will not seek additional compensation for that work.

Administrator. See Alexander v. Coast Prof'l, No. 12-CV-1461,
2016 WL 861329, at *7 (E.D. Pa. Mar. 7, 2016) (holding that,
where class counsel retained and supervised a court-approved and
experienced class administrator, "[t]he claims processing
procedures in place [we]re fair and reasonable").

      The Court concludes that a weighing of the Prudential
factors also underscores the fairness of the Consent Decree.

      3.    The Rule 23(e)(2) Factors

          a.    Whether the Class Representatives and Class
                  Counsel Have Adequately Represented the
                  Class

      In making this determination, "the focus at this point
is on [counsel's] actual performance." Fed. R. Civ. P. 23(e)(2),
advisory committee's note to 2018 amendment. The Court concludes
that this factor weighs in favor of settlement. In addition to
the points raised above in connection with the adequacy of the
class representatives and class counsel, it is clear that
Plaintiffs' counsel is well informed, and their actual
performance has been laudable.

          b.    Whether the Proposal Was Negotiated at Arm's
                  Length

      Here, all evidence points to an arm's length
negotiation, including the involvement of a neutral facilitator.
See supra Fn. 4; Fed. R. Civ. P. 23(e)(2), Advisory Committee's
note to 2018 amendment ("[T]he involvement of a neutral or

court-affiliated mediator or facilitator in those negotiations
may bear on whether they were conducted in a manner that would
protect and further the class interests."). Therefore, this
factor weighs in favor of the Consent Decree.

> c. <u>Whether the Relief Provided for the Class
> Was Adequate</u>

In connection with this factor, Rule 23(e) lists four
subfactors for the Court to consider:

> (i) the costs, risks, and delay of trial and appeal;
> (ii) the effectiveness of any proposed method of
> distributing relief to the class, including the method
> of processing class-member claims; (iii) the terms of
> any proposed award of attorney's fees, including
> timing of payment; and (iv) any agreement required to
> be identified under Rule 23(e)(3)." Fed. R. Civ. P.
> 23(e)(2)(C).

Fed. R. Civ. P. 23(e).

First, as noted in regards to the first <u>Girsh</u> factor,
continued litigation would entail significant time and expense.
As discussed in conjunction with the sixth <u>Prudential</u> factor,
the method for processing the claims is effective and
reasonable. As the Court found in granting Plaintiffs' motion
for fees, the proposed award of attorneys' fees is reasonable.
Finally, the last subfactor is not relevant here.

> d. <u>Whether the Proposal Treats Class Members
> Equitably Relative to Each Other</u>

This factor "calls attention to a concern that may
apply to some class action settlements--inequitable treatment of

some class members vis-a-vis others." Fed. R. Civ. P. 23(e)(2),
advisory committee's note to 2018 amendment. "Matters of concern
could include whether the apportionment of relief among class
members takes appropriate account of differences among their
claims, and whether the scope of the release may affect class
members in different ways that bear on the apportionment of
relief." Id.

  The Restitutionary Claims Consent Decree's tiered
system for monetary awards attempts to distinguish between the
claims of the different types of class members. Under the
distribution plan that the Court has now adopted, every class
member receives a monetary payment and a percentage of the value
of their forfeited property in proportion to the level of
personal culpability found in the underlying criminal case which
led to the forfeiture. The Court concludes that the Consent
Decree with this distribution plan meets this factor because it
appropriately accounts for the differences in claims.[9]

---

[9]  The Court directed the parties to redistribute a
portion of the proposed cy pres award from cy pres to the class
members. See, pp. 6-7, infra. Both parties suggested a tiered
system depending on the outcome of the prosecutions in the
underlying criminal cases. Thus, the Innocent Claimants would
receive the highest distribution, the Diversionary Claimants
would be next, and the Convicted Claimants would receive the
least amount of the recovery.
  The Court recognizes that while the nature of the
constitutional violations is the same across all three groups of
Claimants, the harm caused by the constitutional violations
varies with the most harm inflicted upon the Innocent Claimants

The Court also concludes that the $2,500 incentive payment for the Named Plaintiffs is neither unusual nor unreasonable.

In order "to be entitled to an incentive award," a "plaintiff must show: (1) the risks that the named plaintiff undertook in commencing class action; (2) any additional burdens assumed by named plaintiffs but not unnamed class members; and (3) the benefits generated to class members through named plaintiff's efforts." Fry v. Hayt, Hayt & Landau, 198 F.R.D. 461, 473 (E.D. Pa. 2000). This is a high-profile case. The Named Plaintiffs took reputational risks in that their names and their and their families' alleged misdeeds have been publicized in court proceedings, on the parties' websites, and through local and national media. The Named Plaintiffs have also spent considerable time and effort to further the class's cause, far above what was expected of other class members. Finally, the Named Plaintiffs were instrumental in bringing this case and generating the benefits of the Consent Decrees for all class

---

and the least on the Convicted Claimants, with the Diversionary Claimants somewhere in the "middle." Therefore, the Court does not find that the tiered categories based upon the underlying criminal conduct treats class members inequitably as to each other.

members. Thus, the Named Plaintiffs are entitled to a modest
incentive payment of $2,500 each.[10]

For all these reasons, the Court concludes that an
analysis of the Rule 23(e)(2) factors also confirms that the
Consent Decree is fair and reasonable.

> ### 4.   The Fairness of the Monetary Award Structure and the Cy Pres Provision

The Court must also determine whether the cy pres
provision in the Consent Decree is fair, in that it is balanced
with the class' right to receive sufficient direct benefit. In
re Baby Prods. Antitrust Litig., 708 F.3d 163, 174 (3d Cir.
2013); see Schwartz v. Dallas Cowboys Football Club, Ltd., 362
F. Supp. 2d 574, 576 (E.D. Pa. 2005) (providing that in
determining whether a cy pres provision is fair, "the court
should consider (1) the objectives of the underlying statute(s),
(2) the nature of the underlying suit, (3) the interests of the
class members, and (4) the geographic scope of the case").

"The term 'cy pres' is derived from the Norman French
expression cy pres comme possible, which means 'as near as
possible.'" In re Baby Prods., 708 F.3d at 168 (quoting
Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,

---

[10]     The incentive award amount is also not an outlier
among incentive awards granted in other class actions.  For
example, one study of incentive awards granted between 2006 and
2011 indicates that the median incentive award in the United
States was $5,250. William B. Rubenstein, Newberg on Class
Actions § 17.8 (5th ed. Nov. 2018).

84 F.3d 451, 455 n.1 (D.C. Cir. 1996)). The purpose of a cy pres
award in a class action settlement is to provide a method for
distributing any residual settlement funds which may exist after
all known parties are compensated and the fees and costs are
paid.

> Money may remain unclaimed if class members cannot be
> located, decline to file claims, have died, or the
> parties have overestimated the amount projected for
> distribution for some other reason. It may also be
> economically or administratively infeasible to
> distribute funds to class members if, for example, the
> cost of distributing individually to all class members
> exceeds the amount to be distributed.

Id. at 169. When such a residual fund exists, courts may permit
"the parties to distribute to a nonparty (or nonparties) the
excess settlement funds for their next best use--a charitable
purpose reasonably approximating the interests pursued by the
class." Id.

        This is a Section 1983 suit seeking to redress
constitutional injuries. At heart in the competing allocations
submitted by the parties for the distribution of cy pres is
whether the Consent Decree should maximize the recovery by the
class members, or reserve a substantial part of the recovery for
abetting social conditions in the geographic area where most
members of the class reside. Of course, cy pres awards are
appropriate and legitimate and under certain circumstances can
even serve a public purpose. But when there is a fund available

and eligible class members who can benefit from further
financial distribution at little administrative cost, the Court,
as fiduciary to the class, must intervene.

At the final fairness hearing, the Court concluded
that a 27% cy pres award was not in the best interest of the
class members and, thus, was not fair. "Cy pres distributions,
while in our view permissible, are inferior to direct
distributions to the class because they only imperfectly serve
the purpose of the underlying causes of action--to compensate
class members." Id. Reduction of the unexpectedly large cy pres
award will allow additional compensation for the class members
whose constitutional rights were violated.

The Defendants contend that, under their proposal,
which raises the award to the Innocent and Diversionary
Claimants (but not to the Convicted Claimants), the class
members would be "fully compensated" for the alleged
constitutional violations perpetrated upon them, as well as the
fear, loss, frustration, and anxiety that accompany those
violations. The Defendants suggested that the larger cy pres
award be donated to community social agencies in the geographic
area where most of the class members reside who were the subject
of the unconstitutional forfeitures. The Defendants contend that
this distribution would better address the root issues raised in

this lawsuit and that anything more to the class members would
be a windfall, especially for the Convicted Claimants.[11]

The Defendants' suggestion marginally lowers the cy
pres fund from 27% to 21%, which the Court concludes is not
sufficient to address the Court's concerns and earn its
approval. "Barring sufficient justification, cy pres awards
should generally represent a small percentage of total
settlement funds." Id. at 174. The Court concludes that the
Defendants have not provided "sufficient justification" for
their proposal of a significant cy pres award at the expense of
greater awards to the actual members of the lawsuit.

Thus, the Court declines to follow the Defendants'
suggestion. One, this large cy pres award (21% of the recovery)
conflicts with Third Circuit jurisprudence. See Id. at 169 ("Cy
pres distributions . . . are inferior to direct distributions to
the class."). Two, while distributions to social agencies may be
a laudable goal, a cy pres award is not a vehicle by which the
court, the parties, or counsel may use monies from the class
settlement to propagate their own brand of social justice.
Three, while there is no magic formula that defines the size of
an award which compensates class members for the violations of

---

[11]      And yet, the Defendants have already agreed that
compensating this class of claimants, albeit at a lower rate, is
appropriate.

their individual rights, here, the Court finds no "obvious windfall" or "excessiveness" in the individual amounts to be distributed to the Convicted Claimants.

The Court concludes that class counsel's distribution suggestion in which: (1) the Innocent Claimants receive $800 (instead of $90) and 100% of the value of their forfeited property; (2) the Diversionary Claimants receive $600 (instead of $90) and 75% of the value of their forfeited property; and (3) the Convicted Claimants receive $200 (instead of $90) and 0% of the value of their forfeited property, is the fairest of the competing suggestions. This distribution allots nearly all the settlement money to the class members, whom the Third Circuit has held should be the primary recipients of a class settlement.

The cy pres recipient chosen by the parties is the Philadelphia Foundation. The Philadelphia Foundation describes itself as follows:

> For more than a century, Philadelphia Foundation has increased philanthropic investment in the community, fostering the economic, civic and social vitality of Greater Philadelphia.

> We take charitable dollars further through our deep relationships in the community, close connections with local nonprofits and 100-year history of building positive outcomes in the Philadelphia region.

> Born of a desire for more powerful, permanent funding to address community needs, we collaborate with thousands of individuals, families and businesses to advance this goal, always with an eye on the future. As we enter our second century of service, our

> vision remains grounded in the needs of today and
> tomorrow and is shaped by the values we hold close,
> including excellence, diversity, equity and results.
>
> From Ben Franklin's civic gift of 1,000 pounds
> sterling to Gerry Lenfest's endowment for independent
> journalism, Philadelphia Foundation stewards legacies
> that strengthen the place we call home, improving
> lives today and for future generations.

https://www.philafound.org/about-us (last visited January 26,

2021). The Court concludes that designating the remaining funds,

which should amount to about $24,000, to this organization for

the express purpose of aiding those communities that were most

affected by the forfeiture scheme furthers the goals of Section

1983 and the goals of this case. It also aligns with the

interests of the class members and is geographically relevant.

Thus, the Court concludes that the award structure and

cy pres provision, as described by the Court, contribute to the

overall fairness of the settlement.

## III. CONCLUSION

In that Rules 23(a) and (b)(3) have been met,

certification of the settlement class is proper. Moreover, a

review of the Girsh, Prudential, and Rule 26(e)(2) factors

indicate that the terms of the Consent Decree, as described by

the Court, appear fair, reasonable, and adequate, and the

purpose of the cy pres award, the designation of a recipient,

and the reduced amount of the award adds to the overall fairness

of the settlement. As a result, the Court will grant in part Plaintiffs' Consent Motion and Memorandum in Support of Final Approval of Class Certification and Consent Decree on Plaintiffs' Fifth and Sixth Claims for Relief, certify the Restitutionary Class, and will approve the Consent Decree as modified above.

An appropriate order follows.